**Richmond.**

## SMOOT v. PEOPLES PERPETUAL LOAN & BUILDING ASSOCIATION.

### MARCH 17, 1898.

#### Absent Cardwell and Riely, JJ.

1. USURY LAWS—*Power of Legislature Over—Power of Courts—Case in Judgment.*—It is within the power of the legislature to designate what transactions shall be subject to, and what shall be exempt from, the influence of the laws against usury. It may take away the defence of usury, or it may remove a disability to contract which it had previously imposed. And though a court cannot, by charter, create a corporation with power to make contracts contrary to the usury laws, the legislature may. In the case in judgment, the legislative enactment has rendered valid contracts which were previously usurious, and this is a valid exercise of power.

2. CONSTITUTIONAL LAW—*Bill of Righs—Exclusive Privileges—Heredity in Office—Legislative Powers.*—Section 6, Art. I, of the Bill of Rights of this State which declares "that no man, or set of men, are entitled to exclusive or separate emoluments or privileges from the community but in consideration of public services; which, not being descendible, neither ought the offices of magistrate, legislator, or judge, to be hereditary," was intended to provide against heredity in office, and has no application to the private relations of the citizen, nor to the power of the legislature to pass laws regulating the domestic affairs of the people, or any portion of them.

Appeal from two decrees of the Circuit Court of the city of Roanoke, pronounced May 19, 1896, and October 9, 1897, in a suit in chancery wherein the appellant was the complainant, and the appellees were the defendants.

*Affirmed.*

The opinion states the case.

*Scott & Staples,* for the appellant.

*Archer L. Payne* and *Watts, Robertson & Robertson,* for the appellees.

KEITH, P., delivered the opinion of the court.

The only question to be considered in this case is whether the transactions between Smoot and the People's Perpetual Loan and Building Association were usurious. The Circuit Court held that they were not.

This Association was organized under the charter granted by the judge of the Corporation Court of the city of Roanoke in 1887. By it the Association was authorized to make loans to its members, or others, and to receive as security for loans thus made their shares, either by way of redemption or hypothecation, and to take deeds of trust or mortgages on any real or personal estate or collateral security for the repayment of the loans or advances in such instalments as might be agreed upon. In the case of a redemption, the shares so redeemed were to be cancelled, but the members were in no wise relieved from their obligation to perform all the duties they had assumed to the Association, and for their failure to discharge them could be subjected to like fines and penalties as though their shares of stock had not been redeemed. It was made lawful for the Association to receive in advance interest on its loans, and to charge and deduct, upon the redemption of shares, such premiums for the privilege of having them redeemed as might from time to time be fixed by the board of directors, or agreed upon between the corporation and the parties so having their shares redeemed.

In the preamble to an Act of the Legislature, approved January 23, 1896, p. 170, the charter granted by the court is set out in full, and it then proceeds as follows:

"And, whereas, said charter was duly accepted, and has been acted under by said Association; and, whereas, some doubt has

arisen as to the authority of the said Corporation Court of Roanoke to grant said charter upon the terms set forth in said certificate; therefore,

"Be it enacted by the General Assembly of Virginia, that said charter be, and the same is hereby, declared to be, as to all contracts entered into by said Association in accordance with the provisions of the aforesaid certificate, as valid to all intents and purposes as if originally granted by the General Assembly of Virginia."

The contention on the part of the appellant is that the dealings between himself and the Association were usurious; that they cannot be maintained upon the theory that the relations existing between the company and its members were those pertaining to partnership; that a charter granted by the court will not relieve transactions entered into under it of the imputation of usury; and that the act, approved March 1, 1894, entitled "An act to define the powers and limitations of Building and Loan Associations," has no retroactive effect.

All these positions are well taken in the judgment of this court. In support of them we are content to refer to the cases of *Crabtree* v. *Building Association,* and *Ware* v. *Building Association,* just decided. *Ante, pp.* 670, 680.

It is further contended on behalf of the appellant that the act of January 23, 1896, in the first place, does not undertake to validate the contracts under investigation; and, secondly, that if such were the purpose of the act, it would be unconstitutional and void.

The charter granted by the Corporation Court confers power upon the Association thereby created to receive in advance interest on loans, and to charge and deduct upon the redemption of shares such premiums for the privilege of having them redeemed as may from time to time be fixed by the board of directors, or agreed upon between the corporation and the parties so having their shares redeemed. The Association was authorized to pass by-laws, and create such fines and forfeitures as might be

reasonable and proper to enforce the payment of all instalments and other dues on the part of those subscribing to its stock, or borrowing money from it.

These provisions in the charter seem sufficient to warrant the dealings which took place between Smoot and the Association. A doubt was entertained as to the efficacy of the charter granted by a court to protect a transaction which could be questioned upon the ground of its usurious nature, and in order to put that doubt at rest resort was had to the legislature. The mischief which it was intended to remedy by the act under consideration is apparent. The purpose of those who sought legislative intervention was to remove the taint of illegality from contracts theretofore made by the People's Perpetual Loan & Building Association. The charter was recited in the preamble of the act. The motive of the act is declared upon its face to have been to quiet doubts that had arisen with respect to the powers conferred upon this Association by the charter granted by the court; therefore, it was enacted that "the charter be, and the same is hereby declared to be, as to all contracts entered into by said Association in accordance with the provisions of the aforesaid certificate, as valid to all intents and purposes as if originally granted by the General Assembly of Virginia." There are some things so clear that the attempt to elucidate them serves rather to obscure, and we find ourselves confronted by this difficulty in the endeavor to render more plain and certain the meaning and scope of this act. The charter and all contracts made in accordance with its provisions are declared to be as valid to all intents and purposes as if originally granted by the General Assembly of Virginia. The question, therefore, resolves itself into one of power upon the part of the legislature, for the intent seems to be too manifest to be a subject of real controversy.

It is claimed by appellant that the construction which we have given to the act renders it unconstitutional, the legislature being without power to confer such privileges.

In support of this position he relies upon sec. 6, Art. 1, of the

Bill of Rights, which declares "that no man, or set of men, are entitled to exclusive or separate emoluments or privileges from the community but in consideration of public services; which, not being descendible, neither ought the offices of magistrate, legislator or judge to be hereditary."

This Commonwealth, on the 29th day of June, 1776, adopted a Bill of Rights and Constitution and proclaimed herself a sovereign and independent State, five days before the birth of these United States, a circumstance, it may be observed in passing, which should fix the date of our independence, and be kept in perpetual memory by being embodied in the writs of courts, and the formal acts of the various departments of our State government. In the paragraph quoted from that Bill of Rights we have the statement of a general proposition followed by an illustration which shows beyond peradventure the evil at which the provision under consideration was directed. Our forefathers were wise and practical men. They were neither political speculatists, nor dreamy enthusiasts. They did not strive for an impossible equality, such as has never existed in any society where men have ceased to be equally savage or equally wretched. They did not seek to establish a government theoretically perfect, but, guided by the light of experience, it was their aim to found institutions under which their descendants, secured in the enjoyment of life, liberty, and property, might be free, prosperous, and happy so long as they possessed the wisdom and virtue essential to the preservation of their glorious heritage. They knew the wrongs by which they had been oppressed, and the evils which they had endured under a government of hereditary magistrates and rulers, and it was to shield themselves and posterity from their recurrence that the immortal Bill of Rights was adopted, which was, is, and will remain, the noblest and most comprehensive declaration of the rights of man.

For more than a century we have lived under that great charter of freedom. During that time corporations without

number have been created, all of which have enjoyed privileges not conferred on the mass of citizens. Building Associations have been formed under which contracts have been made obnoxious to the charge of usury, unless warrant for them is found in the statutes under which they were organized. See *White v. Mech. Building Association*, 22 Gratt. 233; *Building Association v. Ashworth*, 91 Va. 706; *Nickels v. Building Association*, 93 Va. 380, and many other cases. During all this period no such question has been raised. It is appalling to contemplate the consequences which might follow from the decision which we are asked to make. If this court ought, in the discharge of its duty, so to decide, then it is safe to say that all the courts of the Union should likewise so declare, for it is believed that there are few State constitutions without provisions similar to, and in many instances even more stringent than, ours. If it be the law, it applies with equal force to foreign and domestic corporations, for it would scarcely be contended that the legislature of New York could confer upon corporations created under its authority a power to be exercised in Virginia which would be denied to a domestic corporation. If such be the law, however grave the consequences, it would be our duty so to declare. The Supreme Court of Kentucky so held in the case of *Gordon v. Winchester Building and Loan Association*, 12 Bush. 110, and that decision has since been reaffirmed by that court.

A different view, however, has been taken by other courts. In *Loan Association v. Robinson*, 69 Ala. 413, it is said: "The General Assembly ordained the statute against usury, and its power to designate transactions which shall be deemed offensive to, or which shall be excepted from, the influence of the statute, cannot be questioned. When that body lends express sanction to a particular transaction, that transaction is withdrawn and excepted from the operation of the statute."

The Court of Appeals of Mississippi, in the case of *Williams v. Cammack*, 27 Miss. 209, held that "The clause in the constitution which declares that 'no man or set of men are entitled to

separate public emoluments or privileges from the community but in consideration of public services,' has no reference to the private relations of the citizens, or to the action of the legislature in passing laws regulating the domestic policy and business affairs of the people, or any portion of them." See, also, *Bibb County Ass'n* v. *Richards*, 21 Ga. 592.

In *Town of Danville* v. *Pace*, 25 Gratt. 1, a statute was considered which took away from corporations the right to make the defence of usury. It was retroactive in its operation, but was held to be constitutional by this court in a luminous and convincing opinion delivered by Judge Staples.

If a corporation may be denied the right to plead usury as to existing contracts, is it a greater stretch of authority upon the part of the legislature to create a corporation to which individuals may by their voluntary contracts bind themselves to pay more than the rate of interest allowed by law? In the one case the legislature was held to have the power to deprive corporations of a right conferred by existing law; in the other case the power of the legislature is invoked to remove a disability to contract which it had imposed.

Statutes which validate contracts, otherwise invalid, are sustained when "they go no farther than to bind a party by a contract which he has attempted to enter into, but which was invalid by reason of some personal inability on his part to make it, or through neglect of some legal formality, or in consequence of some ingredient in the contract forbidden by law." Cooley on Con. Lim. (6 ed.), p. 460.

We are of opinion that the act of January 23, 1896, is constitutional; that it suffices to remove any doubt that may have existed as to the authority of the Association to contract and deal with its members in the manner disclosed by this record; and that therefore the transactions here complained of are not usurious.

The arguments which we have considered, when addressed to courts, call for a decision upon the constitutional powers of the

legislature.    With the policy or impolicy of an act of the Gen-
eral Assembly the courts have no concern.    Unless clearly re-
pugnant to the Constitution of the United States, or of the
State, we have no choice but to construe and enforce them.    Nor
can we protect the improvident against the consequences of their
own folly, and we cannot do better than to close this opinion
by a quotation from the opinion of Judge Anderson, in the case
of *White* v. *Mech. Building Association, supra*: "It is con-
tended on the one hand that Building Associations," says he,
"operate very beneficially to the man who has but small means,
and who is destitute of a home that he can call his own, as it will
enable him to acquire property in a home for himself and family,
and pay for it in the course of six or eight years, at a cost very
little exceeding what he would have to pay for a leasehold for
the same period.    On the other hand it is contended that the
exactions operate as a grinding oppression on those who find
themselves unable to meet the requisitions.    Which of these
opinions is correct we will not undertake   to say.    If the
transactions and dealings of this Association with its members
are warranted by statute, and that statute is warranted by the
constitution, though they may operate harshly and oppressively,
it is not the province of the courts to relieve.    The fault is
in the law, which the legislature alone can alter, or in the im-
providence of the party, which neither the legislature nor the
courts can remedy."

These wise and pregnant observations were delivered more
than twenty-five years ago, and during all of the intervening
period legislatures and courts have continued to recognize and.
foster Building Associations.

We find no error in the decree of the Circuit Court, and it is
affirmed.

*Affirmed.*