ANTONIO T. CAROZZA ᴇᴛ ᴀʟ. *v.* FEDERAL FI-
NANCE & CREDIT COMPANY ᴇᴛ ᴀʟ.

*Usury—Loan to Corporation—Interest of Individual—Corpo-
rate Entity—Attempt to Evade Usury Law—Corpo-
rate Borrower—Constitutionality of Statute.*

A loan in terms to an existing corporation, for which it gave
its corporate obligation, under the usual forms of corporate
authorization, cannot be regarded as a loan to an individual,
merely because such individual owned all of the stock of the
corporation, pledged his own property as security, and gave his
personal guaranty therefor.                    pp. 236-239

The equitable rule, that the form of a corporate entity may
be disregarded where the ownership of all its corporate stock
is in one person, is not of general application, but is commonly
limited to those instances in which it becomes necessary to dis-
regard a formal corporate existence to prevent fraud or imposi-
tion, or to enforce a paramount and superior equity.    p. 238

Where a company erecting an apartment house, and the con-
tracting company doing the actual construction work, were con-
trolled by one individual, who owned practically all the stock
in both, and it was arranged that the apartment house com-
pany should borrow $220,000 at six per cent. per annum, with a
bonus of $75,000, in order to complete the building, the usury
in the transaction remained, although the payment of the bonus
was effected by the delivery of the apartment company's' bonds
to the contracting company, which went through the form of
selling them to the lender for $220,000.          pp. 239-241

Usury is a question of intention, and in the search for that
intention no shift or device is permitted to thwart the inquiry,
and the real substance of the transaction will determine its
nature, and not the color or form it has assumed.    p. 239

A corporation having secured a loan of $220,000 at six per
cent. interest, by the giving of bonds for $75,000, representing
a usurious bonus of that amount, *held* that a mortgage for $50,-

000, subsequently given to the lenders by guarantors of the loan, on their own property, was merely a renewal obligation for a portion of the original usurious exaction, and could not be considered a renewal, in whole or in part, of the indebtedness of the corporation for the sum actually loaned, the loan having been paid in full with interest.                            pp. 241, 242

That, at the time of the giving of the mortgage, the mortgagees delivered their checks for the amount of the mortgage, was immaterial, they receiving at the same time checks covering in full the whole of the usurious bonus.          pp. 241, 242

The substitution of new notes, secured by a mortgage on part of the property covered by a former mortgage, *held* not to purge usury in the latter, the same usurious consideration persisting, although the principal debtor in the earlier obligation was dropped from the new obligation, and the relation of the mortgagors to the mortgagees was changed from that of guarantors to that of principal debtors.                            p. 244

Code, art. 23, sec. 131, providing that no corporation shall hereafter interpose the defense of usury in any action at law or in equity, is not unconstitutional as class legislation or as depriving corporations of the equal protection of the law.
                                             pp. 247-250

Under Constitution, art. 3, sec. 57, the Legislature has ample power to change the legal rate of interest by a general law upon the subject.                                    p. 247

The effect of Code, art. 23, sec. 131, depriving corporations of the right to interpose the defense of usury, being to leave lenders and corporate borrowers free to agree upon any rate of interest above the regular limit, guarantors and sureties on the obligations of such borrowers are bound to the extent of the principal obligation, and are without any right to set up usury as a cause of action or a defense.                            pp. 250, 251

*Decided December 9th, 1925.*

Appeal from the Circuit Court for Baltimore County, In Equity (OFFUTT, C. J.).

Bill by Antonio T. Carozza and Margaretta Carozza, his wife, and Harry M. Rowe, Sr., against the Federal Finance

and Credit Company and the Baltimore Acceptance Corporation. From a decree for defendants, plaintiffs appeal. Affirmed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, DIGGES, PARKE, and WALSH, JJ.

*Shirley Carter* and *J. LeRoy Hopkins,* for the appellants.

*William L. Marbury* and *James Thomas,* with whom were *H. Courteney Jenifer, Theodore C. Waters,* and *Addison E. Mullikin* on the·brief, for the appellees.

PARKE, J., delivered the opinion of the Court.

The appellant, Antonio T. Carozza, was the owner of a property in Baltimore County known as "Ingleside," and on April 29th, 1922, he and his wife, Margaretta M. Carozza, executed a mortgage conveying the same to Addison E. Mullikin to secure an indebtedness of $50,000; and on July 10th, 1922, the mortgagors gave a mortgage lien on the same property to Harry M. Rowe, Sr., as security for a contemporaneous loan of $60,000. Mr. Mullikin assigned the mortgage debt and deed on May 1st, 1922, to The Federal Finance and Credit Company and to the Baltimore Acceptance Corporation, which were his principals in the loan; and, default occurring, foreclosure proceedings were begun on June 1st, 1923. Upon the theory that the mortgage to Mullikin was without consideration, on the ground that the mortgage debt was but a renewal obligation for a portion of a former usurious charge made by the principals against Carozza, the appellants, Antonio T. Carozza and Margaretta M. Carozza, his wife, and Harry M. Rowe, Sr., began proceedings in equity and secured an injunction against the foreclosure. After the bill of complaint was amended in conformity with the judgment of the chancellor on a demurrer interposed to the original complaint, answers were filed, and testimony was taken in open court and the bill of complaint was dismissed on the proof.

The appellants insist that there should be a reversal because they contend that the entire mortgage debt is without consideration and is merely a renewal of a part of a former wholly usurious obligation which, while in the form of a purporting corporate debt under an issue of bonds, actually was the personal loan of Antonio T. Carozza upon his individual credit and the security of his own property and that, by reason of his ownership of all the capital stock of the corporate obligor at the time of the creation of the debt, the corporate obligor was none other than Carozza himself. It is also argued by the appellants that the statute providing that corporations shall not plead usury is void on constitutional grounds. These positions present issues of fact and of law, and a statement of the controlling facts will be necessary in order to grasp their significance.

The Hopkins Building Corporation, a Maryland corporation that owned a lot of land at the northwest corner of St. Paul and Thirty-first Streets in Baltimore City, proposed to build and operate on this site a large apartment house to be known as the Hopkins Apartments. The contract to build this apartment house was let to the Fisher & Carozza Bros. Company, a corporation engaged in construction, for the sum of one million three hundred thousand dollars ($1,300,000), which included, it was said, the price of the lot and the cost of the buildings. The control of both corporations from their origin was in Antonio T. Carozza, one of the appellants, who was their president and who was vitally concerned in their success because he was then the owner of almost all of their stock.

Through the efforts of its president, Antonio T. Carozza, the Hopkins Construction Corporation secured the agreement of the Commonwealth Finance Company to furnish, for a bonus of one hundred and eighty thousand dollars, the sum of nine hundred thousand dollars, payable in monthly instalments of specified but varying amounts, which, with the last payment of fifty thousand dollars in November, 1921, should equal the total of nine hundred thousand dollars.

The details of the agreement were set forth in a paper writing or "committal" dated at Washington on April 30th, 1921, and addressed to the Hopkins Building Corporation over the signature of William A. Mills, the agent of the Commonwealth Finance Corporation.   And on this "committal" appears this endorsement:

"I hereby accept the within commitment and loan and guarantee repayment of same as mentioned.   This, the second day of May, 1921.

"A. T. Carozza.   (Seal)"

In pursuance of this agreement, the Hopkins Building Corporation, on May 9th, 1921, gave to William A. Mills, the agent of the lender, a first mortgage lien on its lot for an ostensible subsisting indebtedness from it to Mills of one million and eighty thousand dollars on its obligation in that amount and of like date with the mortgage, payable fifty thousand dollars on the first day of January, 1922, and fifty thousand dollars on the first day of every month thereafter until December 1, 1922, when the whole of the unpaid residue of the principal and the interest at the rate of six per centum per annum fell due.   And in further performance of the terms under which this loan was obtained and, as a substitute for a costly corporate bond to the lender guaranteeing the completion of the apartment house when and as planned, Antonio T. Carozza and his wife gave a second mortgage, on May 5th, 1921, to the lender, on the Lake Drive Apartment House in Baltimore City, which belonged individually to Antonio T. Carozza, and which was subject to an outstanding mortgage of two hundred and fifty thousand dollars.   The second mortgage was in the amount of two hundred thousand dollars, without interest during a period of two years, and was to remain a lien until the Hopkins Apartments had been completed and their corporate owner had paid three hundred thousand dollars on account of the principal of the loan of one million and eighty thousand dollars.   These paper writings were duly assigned by the agent, William T. Mills, to his principal, the Commonwealth Finance Company, which

made the first payment under this plan of fifty thousand dollars on May 5, 1921, and which thereafter made monthly payments, until by October 1st, 1921, the sum of $564,-033.85 had been advanced on the promised aggregate of $900,000.

The requisition of the Hopkins Building Corporation for October 5th, 1921, was $232,249.88, but it was not forthcoming from the Commonwealth Finance Company, which promised, however, to pay in instalments of $116,124.93 on or before October 25, 1921. and of $103,716.27 on November 5, 1921. The first instalment was paid, but the second was not, and, as the Commonwealth Finance Company failed to pay anything more, the total advances made by it to the Hopkins Building Corporation aggregated $680,158.79.

By reason of this default, the Hopkins Building Corporation was in a most precarious situation. Under a recorded purporting mortgage indebtedness of $1,080,000 on an unfinished apartment, with a liability to the Fisher & Carozza Bros. Company in the sum of at least six hundred and twenty thousand dollars on account of the building of the Hopkins Apartments, and with no liquid resources and its credit impaired, the financial situation was acute, and particularly so because, of the sum due the construction company, the amount of two hundred and twenty thousand dollars was owing to sub-contractors, who were demanding a payment, which could not be met until the Hopkins Building Corporation would discharge its indebtedness to the Fisher & Carozza Bros. Company.

In this emergency two hundred and twenty thousand dollars in money had to be procured immediately in order to complete the Hopkins Apartment House. An application was made to the Federal Finance & Credit Company and the Baltimore Acceptance Corporation, two corporations engaged in lending money. After surveying the situation, doubt arose if the mortgage of the Commonwealth Finance Corporation to secure the purporting subsisting loan of $1,080,000 was a lien on the land granted because, at the time of the

execution of the mortgage, the debt between the parties was but fifty thousand dollars, and the mortgage was, in fact, to obtain a lien of $1,080,000 for future advances of money to the extent only of $850,000, and there was no compliance by the mortgage with the statutory condition precedent that a mortgage to secure future loans or advances shall not be valid unless the amount or amounts of the same and the times when they are to be made shall be specifically stated in the mortgage. *Bagby's Code,* art. 66, sec. 2.  See *High Grade Brick Co. v. Amos,* 95 Md. 571; *Western Nat. Bank v. Jenkins,* 131 Md. 239; *Loan and Savings Ass'n v. Tracey,* 142 Md. 211.

The money lenders concluded that they would grant to the Hopkins Building Corporation the desired loan of two hundred and twenty thousand dollars at six per centum interest a year for eight months, for a bonus of seventy-five thousand dollars, provided the principal, interest and bonus could be legally secured by a lien upon (a) the Hopkins Apartments of the borrowing corporation and (b) the Lake Drive Apartments in Baltimore City and the tract of land in Baltimore County, called "Ingleside," which were both owned by Antonio T. Carozza.  In addition, it was a part of the program to institute equity proceedings to set aside the mortgage deed of the Hopkins Building Corporation to William A. Mills to secure an alleged indebtedness of $1,080,000, that had been assigned by Mills to the Commonwealth Finance Corporation.  By these proceedings it was hoped to secure for the two lending corporations a first mortgage lien on the borrower's property, either through a compromise settlement and release of the Commonwealth Finance Corporation's claim on the basis of the money actually advanced, with interest, or through a cancellation by the court of the mortgage lien.

The form and manner evolved for the securing of the loan and the bonus were elaborate:

1.  The Hopkins Building Corporation would issue its negotiable bonds of one thousand dollars each, dated Decem-

ber 15th, 1921, and payable June 15th, 1922, and bearing interest at the rate of six per centum per annum, aggregating $620,000, in two series, of which Series A should be a first mortgage, and Series B should be a second mortgage lien on the property conveyed by the deed of trust securing the payment of the bonded indebtedness, and of which Series A should aggregate $220,000, and be numbered 1 to 220, inclusive, and Series B should total $400,000, and be numbered 1 to 400, both inclusive; and the deed of trust would convey the Hopkins Apartments to secure the payment of these bonds; and the appellants, Antonio T. Carozza and Margaretta M. Carozza, his wife, "for the purpose," as recited in the deed of trust, "of further securing the holders of said bonds by pledging certain property against which the lien on said properties should only be enforceable to the extent of any deficit that may arise after the enforcement of the mortgage against the property of the Hopkins Building Corporation," would convey the Lake Drive Apartments and the tract named "Ingleside."

II.    The deed of trust should recite the indebtedness of the Hopkins Building Corporation in the sum of $620,000, the total amount of the authorized issue of bonds, to the Fisher & Carozza Bros. Company, for the residue of the contract price due on account of the erection of the Hopkins Apartments, and the indebtedness of the Fisher & Carozza Bros. Company to various sub-contractors in the sum of $220,000 for work done and materials furnished in the course of the erection of the Hopkins Apartments, and the necessity of the Hopkins Building Corporation to raise this last amount, so as to pay the said sub-contractors and the additional sum of $400,000 to discharge its full liability to the Fisher & Carozza Bros. Company; and further the deed of trust should provide that the trustees certify and deliver to the Fisher & Carozza Bros. Company, "in consideration of the settlement of the indebtedness aforesaid," all of the authorized issue of bonds, and, pending the preparation of the permanent bonds, the Hopkins Building Corporation

should prepare and deliver to the trustees, for certification and delivery to the Fisher & Carozza Bros. Company temporary bonds of like tenor and form as described in the deed of trust, but different in amounts, as follows: (a) temporary certificate for $220,000 of Series A; (b) temporary certificate for $80,000 of Series B; and (c) temporary certificate for $320,000 of Series B.

III. When the temporary bond certificates were ready for delivery the lending corporations would pay to the Fisher & Carozza Bros. Company the sum of $220,000 as agreed, and receive therefor (1) all of the issue of first mortgage bonds, known as Series A, amounting to $220,000 in principal, and $75,000 of the second mortgage bonds, being a part of Series B; (2) an acknowledgment by the Fisher & Carozza Bros. Company (a) that its acceptance of Series A and B of the bonds was in full payment of all indebtedness or obligations of the Hopkins Building Corporation; and (b) that the entire amount due or to become due and owing to subcontractors for work or materials on the Hopkins Apartments does not exceed the sum of $220,000; and that the sum received by the Fisher & Carozza Bros. Company from the buyers of the bonds would be used in the liquidation of all claims of such contractors, and that such buyers would have the right to see to the application of the purchase money for the bonds; and (3) a certificate from the Hopkins Building Corporation (a) that it had no creditors and owed no debts other than the bonds known as Series A and B, and such amount as might be due to the Commonwealth Finance Corporation; and (b) that the issue of the bonds to the Fisher & Carozza Bros. Company in the amount of $620,000 in Series A and B liquidated in full all of the indebtedness of the Hopkins Building Corporation to the Fisher & Carozza Bros. Company.

IV. And, immediately following the execution of the deed of trust, Antonio T. Carozza and Margaretta M. Carozza his wife, would enter into a contract with the Federal Finance and Credit Company and the Baltimore Accept-

ance Corporation, (1) to guarantee to these two corporations the payment of any deficiency between the par value ($295,-000.00) and interest of the bonds and the amount received by the said corporations for the sale or redemption of said bonds on June 15th, 1922, with a stay of the enforcement of any obligation arising under this guaranty until August 15, 1922; and (2) to promise not to dispose of or encumber any of the real estate of the guarantors, except a property on Seminole Avenue in Catonsville, until the principal and interest of said bonds should be paid.

The procedure so formulated was possible only through the complete co-operation of all the parties, and this was assured by the imperative exigency of the situation and the controlling ownership of Carozza in both the Hopkins Building Corporation and the Fisher & Carozza Bros. Company. The projected plan was carried through with meticulous fidelity to all the formal requirements of such corporate acts. And on December 23rd, 1921, the Hopkins Building Corporation, Antonio T. Carozza and Margaretta M. Carozza, his wife, Duke Bond and Lee S. Meyer, trustees under the deed of trust to secure the bonds, began equity proceedings against William A. Mills and the Commonwealth Finance Corporation to have declared null and void the mortgage and mortgage note given by the Hopkins Building Corporation in the purporting loan of $1,080,000, on the repayment by the Hopkins Building Corporation of such amount as should be found due and owing. This bill of complaint was met by a counter bill of complaint of the Commonwealth Finance Corporation and William A. Mills, exhibited against Edwin H. Brownley, Antonio T. Carozza, Duke Bond and Lee S. Meyer, trustees, the Hopkins Building Corporation, the Fisher & Carozza Bros. Company and Margaretta M. Carozza, on the theory that the form of the loan of $1,080,000 and of the mortgage deed securing the same was not in accordance with the agreement and intention of the parties, and praying, among other things, that the mortgage might be reformed so as to remain a lien and be in accord with

the agreement as alleged by the complainants, and that the deed of trust to secure the $420,000 issue of bonds might be declared null and void in so far as it might in anywise affect the lien of the Commonwealth Finance Corporation. This crimination and recrimination of the adverse parties went no further than the pleadings. With the money obtained from the two finance companies, the Hopkins Building Corporation was enabled to finish its apartment house, and this put it in a position permanently to finance its enterprise towards the close of April, 1922, if the conflicting lien claims could be released and the litigation dismissed.

The Metropolitan Life Insurance Company agreed to furnish $500,000 on a first mortgage lien on the Hopkins Apartments, and the Commonwealth Finance Corporation was willing to accept a second mortgage lien of $575,000 on the Hopkins Apartments, and a mortgage on the Lake Drive Apartments, subject to a prior mortgage of $250,000, in liquidation of a like amount of its claim. These two loans would provide a fund of $1,075,000 to refinance the Hopkins Building Corporation, but this amount was insufficient to the extent of approximately $50,000. It was then that Carozza and his wife agreed to procure the necessary funds by a loan from Addison T. Mullikin of $50,000, payable on August 15th, 1922, without interest, and to secure the loan by a mortgage on the property called "Ingleside," which was owned by Antonio T. Carozza, and which was subject to a prior mortgage lien of $70,000, held by the Loyola Building Association. The preliminary authorization of the stockholders and directors of the Hopkins Building Corporation having been first obtained, the two equity causes were dismissed; the mortgage to the Commonwealth Finance Corporation for $1,080,000 was released, and the note for that amount of the Hopkins Building Corporation surrendered and cancelled; the mortgage to Bond & Meyer, trustees, to secure the bond issues of $640,000 was released, and the temporary bond for $220,000 of Series A and the temporary bond for $80,000 of Series B were surrendered by the Fed-

eral Finance & Credit Company and by the Baltimore Acceptance Corporation, and cancelled; and the temporary bond for $320,000 of Series B was also surrendered by the Fisher & Carozza Bros. Company and cancelled. The Hopkins Building Corporation then executed a first mortgage lien on the Hopkins Apartments to secure a corporate indebtedness of $500,000 on the loan of the Metropolitan Life Insurance Company, and a second mortgage loan on the Hopkins Apartments to secure a corporate indebtedness of $575,000 to the Commonwealth Finance Company. In this second mortgage, Antonio T. Carozza and his wife united to convey the Lake Drive Apartments as a further security for the indebtedness. And then Antonio T. Carozza and his wife executed to Addison T. Mullikin their mortgage deed for an indebtedness of $50,000, payable on August 15th, 1922, without interest, and conveyed as security the "Ingleside" property. The discount on this loan made it yield $49,090, and this amount was paid to The Title Guarantee and Trust Company, which was guaranteeing the title and supervising the settlement, by the checks of the Federal Finance and Credit Company and the Baltimore Acceptance Corporation, for which Mr. Mullikin was acting as agent.

The relation of the parties and the manner of settlement will appear from the following tabulation of charges and disbursements:

```
Amount   due   the   Common-
  wealth Finance Corporation
  for money advanced........$680,158.79
Interest  thereon  to  May 1,
  1922 ...................    24,836.30
                             _____
                             $704,995.09
Bonus  agreed  upon.........   75,000.00
                             _____
  Total of obligation assumed..$779,995.09
Credit of portion
  of Title Com-
  pany's fee ....  $1,250.00
```

Credit of mort-
    gage indebted-
    ness of Hopkins
    Building Corp..$575,000.00  $576,250.00

Balance to Com-
    monwealth Fi-
    nance Corp..............$203,745.09  $203,745.09
Bonds held by the Federal Fi-
    nance & Credit Company
    and Baltimore Acceptance
    Corporation:
        Series A ..............$220,000.00
        Series B ..............  75,000.00

                            $295,000.00
Interest thereon to May 1,
    1922 ...................  6,673.34

    Amount due ............$301,673.34
To Federal Finance & Credit
    Company one-half.........$150,836.67
To Baltimore Acceptance Cor-
    poration one-half ........  150,836.67    301,673.34

Water bill .................  $155.72
Taxes on Hopkins Apartments.  20,702.06
Taxes on Lake Drive Apts....  10,065.59
Architect's fee of Met. Life
    Ins. Company ...........  2,542.30
Attorney for Ins. Company..  1,500.00
Fee of Title Guarantee & Trust
    Company ................  2,500.00
Stamps and recording fees....    140.05
To Edwin H. Brownley, Atty.  6,065.85    43,671.57

    Total charges or disbursements........$549,090.00
Amount of funds in hand:
    Amount of mortgage loan of
        Metropolitan Life Insur-
        ance Company .........$500,000.00

Proceeds of mortgage loan
  of the Federal Finance &
  Credit Co. and of the Bal-
  timore Acceptance Corp...    49,090.00   $549,090.00

The evidence of the records and of the paper writing are a complete denial that either the mortgage loan negotiated with the Commonwealth Finance Corporation, or the one made with the Federal Finance and Credit Company and the Baltimore Acceptance Corporation, was upon the basis of the personal credit or the individual property of the appellant, Antonio T. Carozza. The principal debtor was in each instance the Hopkins Building Corporation, a subsisting legal entity. It is true that Carozza conveyed his individual property, by both the mortgage deed and the deed of trust, to secure the payment of the debts of the principal debtor, and that he guaranteed the payment of both debts of the principal debtor. It is doubtlessly correct to say that the loans would not have been made if he had not pledged his individual property and given his personal guaranty. Nevertheless, his obligation was that of a surety or guarantor in relation to the two mortgage loans of $1,080,000 and $620,000. Nor is it unreasonable or uncommon for a stockholder, who is the substantial owner of the corporation, to lend the credit of his guaranty or his property in an effort to prevent financial distress or ruin of the corporation. If a stockholder assumes the legal relation of a guarantor in the transactions of the corporation, he will not ordinarily be heard to deny this chosen status, and to say that a contract made in the name of the corporation, and within its competency, and as its corporate act, was not a corporate, but his own individual, act, because the corporation had ceased to exist, for the reason that he was at the time of the apparent corporate act the sole owner of all the corporate stock. While the appellants offered testimony tending to establish that the bond issue was a loan made by the appellees to Carozza individually and that the Hopkins Building Corporation and the Fisher & Carozza

Bros. Company were not functioning at the time as corporations, because Carozza had acquired all their outstanding stock with the knowledge and at the instance of the two finance corporations, yet the clear weight of even the oral testimony is to the contrary, and when the written evidence is considered, the conclusion is irresistible that the Hopkins Building Corporation and the Fisher & Carozza Bros. Company have never ceased to function as corporate entities.

The narrative in this opinion of corporate acts need not be repeated, but it is sufficient to say that the deed of trust from the Hopkins Building Corporation to Duke Bond and Lee S. Meyer, trustees, dated December 12th, 1921, shows by its recitals that the action taken was pursuant to and in the exercise of its corporate powers; that every requisite precedent authorization of stockholders and directors for the issue of the bonds had been duly given; that the bonds were to be issued as a corporate obligation over the corporate signature, sealed with its corporate seal and attested by its secretary, and to be delivered to the trustees by the Hopkins Building Corporation, which covenanted to pay the bonds on June 15th, 1922. The deed of trust was signed with its corporate name by A. T. Carozza, president, sealed with its corporate seal attested by J. A. Douglas, as its secretary, acknowledged by "Antonio T. Carozza, president of the Hopkins Building Corporation," and Edwin H. Brownley, vice-president of the Fisher & Carozza Bros. Company, made oath to the consideration being true. The temporary bonds were issued in the name of the corporation written by A. T. Carozza, as its president, and attested by J. A. Douglas, as its secretary. Not only was it a going concern, but it was so affirmed in a personal guaranty of Antonio T. Carozza and wife to the two purchasers of the bonds in the amount of $295,000, when it was asserted that Carozza was interested in the Hopkins Building Corporation and would guarantee its payment of these bonds at maturity. Again, on December 23rd, 1921, the Hopkins Building Corporation was a party plaintiff in a cause where it was alleged to be a corporation,

and that "the principal stockholder in the said corporation is the plaintiff, Antonio T. Carozza," who verified the bill of complaint in his official capacity as its president. Furthermore, the Hopkins Building Corporation filed in March, 1922, its report with the State Tax Commission of Maryland, in compliance with the statute, and this report gave A. T. Carozza, with twenty shares, Edwin H. Brownley, with fourteen shares, and John A. Douglas, with one share, as its three stockholders on January 1st, 1922; and was signed by John A. Douglas as its secretary and treasurer, and was impressed with the corporate seal. And finally, the Hopkins Building Corporation on May 1st, 1922, executed a mortgage on its property known as the Hopkins Apartments to the Metropolitan Life Insurance Company for $500,000, and then a second mortgage to the Commonwealth Finance Corporation for $575,000, in full and complete compliance with all the prerequisites and forms of corporate action.

The equitable rule that the form of a corporate entity may be disregarded where the ownership of all of its corporate stock is in one person is not of general application, but is commonly limited to those instances in which it becomes necessary to disregard a formal corporate existence to prevent fraud or imposition, or to enforce a paramount and superior equity. *Bellona Co.'s Case,* 3 Bland, 442, 446; *Bauernschmidt v. Bauernschmidt,* 101 Md. 148, 161, 162; *Bear Creek Lumber Co. v. Bank,* 120 Md. 566, 569-571; *Tompkins v. Sperry, Jones & Co.,* 96 Md. 560, 583; *Swift v. Smith, Dixon & Co.,* 65 Md. 428, 436; *Pott & Co. v. Schmucker,* 84 Md. 535, 552, 554; *Folsom & Co. v. Detrick Fertilizer Co.,* 85 Md. 52, 70; *Matthews v. Headley Chocolate Co.,* 130 Md. 523, 536; *Bethlehem Steel Co. v. Concrete Pile Co.,* 141 Md. 81-85; *Cook on Corporations* (7th ed.), secs. 6, 663, 664; 2 *Machen on Corporations,* secs. 1075, 1078; *France on Corporations* (2nd ed.), sec. 17; *Morawetz on Corporations* (2nd ed.), secs. 232, 234.

It would be an unjustifiable perversion for us to permit

this equitable rule to be invoked, by way of surprise, in aid of deceit.

The status of the Hopkins Building Corporation was that of a going, functioning corporate entity and our conclusion on the record is that, so accepting it, the appellees contracted with the corporation, *qua* corporation; and that the legal relation arising out of and implicit in the contractual obligation of the corporate obligors cannot now be changed to the status of a contract between an individual and a corporation. It is a consequence of this finding of fact that the principal debtor was the corporation, and that Antonio T. Carozza and his wife were the guarantors of the principal debtor's obligation.

2.    The second question of fact is whether the issue and delivery of $220,000 in par value of the first mortgage bonds of the Hopkins Building Corporation, and of $75,000.00 in par value of its second mortgage bonds, upon payment of $221,250.00, was a usurious transaction or an actual sale and purchase of the bonds in good faith. The acquisition of the bonds was in form a sale and purchase, but usury is a question of intention, and in the search for that intention no shift or device is permitted to thwart the inquiry, and the real substance of the transaction will determine its nature, and not the color or form it has assumed. *Tyson v. Rickard,* 3 H. & J. 109; *Andrews v. Poe,* 30 Md. 485, 488; *Rouskulp v. Kershner,* 49 Md. 516, 524; *Montague v. Sewell,* 57 Md. 407; *Gaither v. Clark,* 67 Md. 18, 29; *Bowdoin and Brown v. Hammond,* 79 Md. 173, 181.

From the time that the Hopkins Building Corporation applied for a loan of about $220,000, to be secured by a mortgage deed, this corporation, the Fisher & Carozza Bros. Company, the appellees, and Antonio T. Carozza, had notice and knowledge of every successive step, until the $295,000 in bonds of the first-named corporation were delivered to the appellees on the payment of the sum of $221,250.00. *Tiffany v. Boatman's Savings Institution,* 18 Wall. 375. As stated by Mr. Addison E. Mullikin, the original plan was to borrow

the money of the appellees on a mortgage of the same tenor as that held by the Commonwealth Finance Corporation. What the Hopkins Building Corporation sought was a loan and not a market for a contemplated issue of bonds. This is made quite clear by the weight of the proof. and one quotation from the testimony of Mr. Boone, the secretary and treasurer of the Baltimore Acceptance Corporation, is illustrative. Recalling his first interview, the witness declared that the president of the Hopkins Building Corporation had said: "The stand that the Commonwealth Finance Corporation had taken, that they had fallen down on their advances, and unless they came across within a certain time that they would need some money to complete the Hopkins Apartment. And I felt it would be a good thing for our company to consider taking up the question of making that loan. That the bonus that the Commonwealth was charging, I think he said, was $180,000, and that he would pay us half of that and that he would save the other half if we would come in with that money, because he wouldn't have to pay the Commonwealth, because they had fallen down on their contract. He asked me if I wouldn't take it up with the company, and I did mention it to Mr. Sturm; I mentioned it to Mr. Thomas, who was interested in our company and was Mr. Carozza's banker, and eventually we got together."

As soon as the parties reached that stage of their negotiations, when it was agreed that the lenders would make an actual loan of about $200,000, bearing six per centum interest yearly, provided that they would be paid a bonus therefor of $75,000, and would be secured in the payment of the amount of the loan, with interest, and the bonus exacted by a mortgage lien on the property offered, the usurious nature of the bargaining attached and remained, no matter the method or form under which cover was sought. The technical perfection of the plan evolved for the purpose of making an essentially usurious loan assume the flawless documentary guise of a sale and purchase of corporate bonds, can afford no occasion for the court to blink the nature of the legal fic-

tion designed to veil the usury. The intention to exact more than the legal rate of interest existed at the inception of the contract, and persisted unaltered until the end. It is immaterial that the device adopted provided that the payment of this bonus be secured through the medium of a receipt of second mortgage bonds whose face value was seventy-five thousand dollars. The evidence on this record clearly refuted the contention of the appellees that the transaction was a sale and purchase at a discount, but in good faith, of bonds maturing in six months. 2 *Machen on Corporations,* sec. 1694, and cases cited above; *Webb on Usury,* sec. 61.

3. In the refinancing of the Hopkins Building Corporation in May, 1922, the loan of $500,000 from the Metropolitan Life Insurance Company, and that of $575,000 from the Commonwealth Finance Corporation, were sufficient to pay off all encumbrances and obligations, including the principal and interest of the money actually loaned by the appellees, and all but $50,000 of the usurious bonus with interest. In other words, a total loss to the appellees of this sum of $50,000 merely meant a $50,000 default in the amount of usury promised. So there would have been no mortgage deed from Carozza, if there had been funds available to meet this $50,000 deficit in the agreed usury. It follows that whether this sum of $50,000 was paid to the appellees in money, or was secured to them by a mortgage lien, the new mortgage debt was not a part of the original loan or indebtedness, but a part of the original usurious exaction. The essential nature of this mortgage debt could not be affected by the delivery of appellees' checks for the amount of the mortgage debt, less the discount at a lawful rate, simultaneously with the receipt by the appellees of checks covering in full the whole of the usurious bonus. The result of this exchange of checks would have been accomplished if the appellees had drawn no checks and the amount of the checks issued by the appellees had simply been deducted from the checks received by the appellees. Where, with knowledge on the part of all concerned, a debt is paid by money ob-

tained from the creditors for that purpose and then immediately refunded to the creditors by the debtor, the transaction is not a payment in fact but is a series of merely illusory acts to be dealt with according to their substance and not their form. Consequently, the checks of the appellees were a futile gesture, without effect upon the intrinsic nature of the loan, and by their issuance the usurious bonus cannot be said to have been redeemed or settled for by the obligors in money or other valuable consideration to the amount of the face of the checks. *Border State Perpetual Building Association v. Hilleary,* 68 Md. 52, 54, 55; *Border State Perpetual Building Association v. Hayes,* 61 Md. 599, 600.

Neither can this purporting fresh indebtedness of Carozza and wife to the appellees be considered a renewal, in whole or in part, of the original indebtedness of the Hopkins Building Corporation on account of the money actually advanced by the appellees when the bonds for $295,000 were delivered to them. The principal and interest of the actual loan had been paid them in full, together with a large amount of usury, and only a residue of $50,000 of usury remained unpaid. It is a necessary conclusion that this unsatisfied amount of usury was the only basis for the consideration recited in the mortgage of Carozza and his wife to the appellees. And it was not until the execution and delivery of this mortgage that the bonds representing this usurious loan were cancelled and the deed of trust to Bond and Meyers, trustees, was released. Such a redemption or settlement is no more than a renewal of the usury involved, but it is not a renewal, in whole or in part, of the original indebtedness, which is limited to the amount of the original loan or advance made, without any usurious addition. The sole effect, therefore, of the mortgage deed was to transform the status of Carozza and his wife from that of guarantors to that of principal debtors to the appellees in the sum of fifty thousand dollars on an obligation whose sole consideration was usury.

While the mortgage notes and mortgage deed were given to Mr. Mullikin as mortgagee, this was a formality resorted to for its convenience, and the notes and mortgage deed were promptly transferred to the appellees, the principals of the mortgagee. In no sense was this new mortgage a new contract or novation made for valuable consideration by innocent new parties, whose rights should be held, upon equitable principles, unaffected by the antecedent happenings. It is not necessary to recite the testimony, but it is sufficient to state that the court is bound by the proof to decide that the appellees were affected, at the time of the execution of the mortgage loan and deed, with full knowledge of all the facts and circumstances which, in the judgment of the court, made the mortgage notes and deed an intrinsic part of an original usurious contract in which the appellees were participants at its creation, with knowledge, or charged with notice of the usury exacted. *Brown v. Waters,* 2 Md. Ch. 201. In no sense are the appellees innocent assignees for value, without notice, and, for convenience, we shall hereafter call them the mortgagees, as they actually were in effect.

It is doubtful if the acts embraced in the transactions attending the execution and delivery of the mortgage note and deed of May 1st, 1922, constituted a redemption or settlement by the obligors "in money or other valuable consideration," or if a consideration of a promised amount of usury was a "part of the original indebtedness" within the meaning of section 6, article 49, entitled "Interest and Usury," of Bagby's Code, when read with sections 4 and 5 of the same article and the decisions in *Border State Perpetual Building Association v. Hilleary,* and *Border State Perpetual Building Association v. Hayes,* reported in 68 Md. 52, and 61 Md. 599. But it is not necessary for the court to determine if section 6 has any effect on the rights of the litigants, because the appeal presents a controlling and decisive question of constitutional law.

4.    Assuming that the borrower were not a corporation, it is a necessary consequence of the court's conclusion on the

issues of fact presented by the record, that the taint of usury is upon the mortgage here assailed quite as much as upon the original transaction of which it is the culmination, because under the circumstances of this record usury is not purged by the substitution of new notes secured by a mortgage on a part of the property covered by a former mortgage between the parties, where the same usurious consideration persists, even though the principal debtor is dropped from the new obligation and the relation of the mortgagors to the appellees is changed from that of guarantors to that of principal debtors. The guarantors and the appellees were in privity, and, when the guarantors become the principal debtors of the appellees on an obligation for which they had been the guarantors, the principal debtors were not bound to pay, under the facts of the record, any more of the usurious consideration than their original principal had been bound to pay to the appellees at the time of the execution of the mortgage notes. *Lazear v. National Union Bank,* 52 Md. 78, 120, 123; 39 *Cyc.* 1005; 29 *Am. & Eng. Ency. of Law* (2nd ed.) 517, 519, 533; *Webb on Usury,* secs. 308-312.

On the assumption last made that the original principal borrower was not a corporation, the appellants would be entitled to relief under their bill of complaint, but the Hopkins Building Corporation, the original principal borrower, was a corporation, and the statutory law of Maryland makes a distinction between a corporate and a non-corporate borrower. While a non-corporate borrower is free to plead usury, the statute declares that "no corporation shall hereafter interpose the defense of usury in any action at law or in equity." Code, art. 23, sec. 131. If this be a valid law, the agreement of the principal debtor was valid and enforceable by virtue of the statute; the guarantors thereof were liable, and the mortgage notes and deed the guarantors gave to the appellees would not be usurious, but upon the consideration recited, and, therefore, valid and enforceable. *Infra.*

5.    The Constitutions of 1851 and of 1864 read that "the

rate of interest in this State shall not exceed six per cent. per annum and no higher rate shall be taken or demanded; and the Legislature shall provide by law all necessary forfeitures and penalties against usury." Art. 44, sec. 49 (1851); art. 3, sec. 60 (1864). While this provision was held in *Bandel v. Isaac,* 13 Md. 202, not to be self-executing, but requiring suitable legislative enactment to make it fully operative, nevertheless the provision was an express denial of any statutory authorization of a rate in excess of six per centum yearly. There is, however, no such inhibition upon legislative discretion in our present constitution, which reflects a radical change of public policy in the subsisting section stating that "the legal rate of interest shall be six per cent per annum, unless otherwise provided by the General Assembly." Art. 3, sec. 57. This is a declaration which at once proclaims the lawful rate and confers upon the General Assembly ample power to change that rate and its incidence in any manner and at any time within the limitations of other constitutional provisions.

It was said in *Citizens' Security and Land Co. v. Uhler,* 48 Md., at p. 459: "That the Legislature has the power to prescribe a rate of interest for all persons and all corporations either above or below six per cent. is not questioned. That is, to pass a general law on the subject, but it has no power to authorize one person to charge six per cent. and another ten per cent. and another twenty-five per cent. The pernicious effects of such special class legislation are so obvious, that in the absence of plain language, showing such to be the intention, we are not to presume that either the framers of the Constitution, or the people who adopted it, meant to confer a power so extraordinary on the Legislature." *Birmingham v. Md. Land etc. Assn.,* 45 Md. 541, 543; *Scott v. Leary,* 34 Md. 399, 400.

In the case cited the Court rested its decision upon the view that the Legislature had undertaken "by a special law to authorize a certain class of corporations to loan money at a higher rate of interest than is allowed by the Constitu-

tion and general law of the State." The court recognized the power of the Legislature to pass a general law on the subject. In fact, at that time the class of corporations known as building and loan associations was permitted by a general law, affecting only this class of corporations, to make regulations and exact charges which would have been held usurious in a corporation not within this particular class. *Baltimore Permanent Building and Land Society v. Taylor,* 41 Md. 409, 418. While the early case of *Robertson v. American Homestead Assn.,* 10 Md. 397, was decided under the Constitution of 1851, and adopted the English rule that a building association transaction was not a loan of money but a dealing with a partnership fund, in which the person to whom money was advanced had an interest in common with the other members of the society or association, and while this basis for holding that the transaction was not usurious has never been discarded, yet, even in that case and during that constitutional period, the Court said, with reference to building association mortgages, that it had "no hesitation in pronouncing them, if executed in conformity with the provisions of that act" (*i. e.,* with respect to building associations), "free from all objections on the ground of usury." The later decisions of this tribunal certainly stress the point that, if the statute authorizing the formation of building and loan associations be strictly complied with, the dealings within the scope of the ordinary business of the associations will be relieved of all imputation of usury. *Stewart v. Building Association,* 106 Md. 675; *Washington Building Assn. v. Andrews,* 95 Md. 696, 700; *White v. Williams,* 90 Md. 727; Bagby's Code, art. 23, secs. 161, 169. See 20 *Am. & Eng. Ann. Cas.* 1248, 1254, for cases in other jurisdictions.

Other illustrations may be found in the rate of interest allowed by public general and local law in reference to State and county taxes; and in the general statute permitting any lender, when licensed, to charge interest at the rate of three and one-half per centum per month on a loan not in excess

of the sum of three hundred dollars in amount or value. Bagby's Code, art. 81, sec. 54; art. 58A.

In 1916 the Legislature enacted that "no corporation shall hereafter interpose the defense of usury in any action at law or in equity," and this is now the law. Acts of 1916, ch. 374; ch. 596, sec. 100A; Bagby's Code, art. 23, sec. 131. The legislation applies to all corporations, and so is not within the rule enforced in the case of the *Citizens' Security and Land Company v. Uhler,* 49 Md. 45; and its constitutionality, while not discussed, was implicit in the decision of this Court in *Penrose v. Canton National Bank,* 147 Md. 200, 207, 209. In an able opinion by Chief Judge Bond, this Court held in that case that the effect of this legislation "is to leave lenders and corporate borrowers free to agree upon any rate of interest above the regular limit" of the statutory law. See Bagby's Code, art. 49, secs. 1 to 6; *Kinsey v. Drury,* 146 Md. 227, 233.

The appellants here insist that this statute is unconstitutional on the ground that it is class legislation and deprives corporations of the equal protection of the law. From the prevailing opinion in the appeal of *Citizens' Security and Land Company v. Uhler, supra,* the appellants have taken the sentence, "that the Legislature has the power to prescribe a rate of interest for all persons and all corporations either above or below six per centum is not questioned," to mean that any enactment on the subject-matter is unconstitutional unless it embrace within its purview "all persons and all corporations." The language of this sentence is general, but the context does not warrant this broad deduction. The next sentence restricted the expression merely to mean "a general law," as contradistinguished from a special act, and in view of the plenary and unrestricted nature of the power granted to the General Assembly, we could not assent to any other limitation being introduced into the Constitution by judicial construction.

It should, furthermore, be observed that in the decision referred to the question was whether the franchise or priv-

ilege of charging usury could be conferred upon a particular class of corporations by what the Court termed a special law. The corporation there was a lender. Here the inquiry concerns a borrower, and the legislation includes all corporate borrowers upon which are conferred no additional power or privilege, but which are deprived of a defense whose interposition was wholly a matter of choice on the part of every borrower. See *Ewell v. Daggs,* 108 U. S. 143, 153. The case relied upon by the appellants does not enforce their point. Nor do we find any substantial ground to hold void section 131 of article 23 of the Code.

The principle that unequal and partial legislation is void does not deny to the legislative body the power to make the application of laws, public in their object, embrace all citizens, or include only those within a particular class, as bankers, traders, workmen or corporations, or even particular kinds of corporations, as for example, railway carriers, banking institutions or insurance companies. It is well recognized that, unless express constitutional provisions forbid, the authority which legislates for the state at large must determine whether an enactment should extend to all its citizens or to a single class, and to prescribe distinctions in the rights, obligations, duties and capacities of its citizens, whether natural or artificial. The only restriction upon the power of the legislature to suspend the operation of a general law of the state is that the power when exercised must result in a suspension which is uniform, both in the privileges conferred and the liabilities imposed, in its application to all persons and property similarly situated and in like condition, within either the political territory or the class affected, and which shall not be an arbitrary classification, but one supported by some sound and defensible reason inherent in the subject-matter. *Chesapeake Bank v. First National Bank,* 40 Md. 269; *Clark v. Harford Agric. Assn.,* 118 Md. 608; *Watson v. State,* 105 Md. 650; *Griffith v. Connecticut,* 218 U. S. 563; *Herbert v. Baltimore County,* 97 Md. 639; *State v. County*

*Commissioners of Balto. County,* 29 Md. 512; *Creswell v. State,* 126 Md. 103.

There is general recognition that laws against usury sprang from the notion that the needy and driven borrower was, by reason of his unfortunate circumstances, subject to the dominion of the lender, with disastrous pecuniary loss and personal hardship. Instances of privation and distress were common, and the State conceived it a duty to redress so far as possible the wrongs resulting from the inequality of the contracting parties, by relieving the necessitous borrower of usurious impositions.

The usury laws, therefore, proceed upon the theory that a usurious loan is attributable to such an inequality in the relation of the lender and borrower that the borrower's necessities deprived him of freedom in contracting and placed him at the mercy of the lender. The law regards the borrower as *in vinculis,* and, so, the injury inflicted, and the relief afforded, as personal to the individual wronged. A corporation, on the contrary, is not a natural person, but an artificial legal entity, which intervenes between the lender and the persons who own its stock or form its membership. It is organized for commercial or other purposes, which are best subserved by the advantages given through the corporate powers conferred by the State of which it is the creature. It has no sensations and cannot be coerced by its necessities into any legal obligations beyond its defined and limited corporate powers. It is primarily a creature of the law, under which capital concentrates for business and other gainful ends in an amount judged sufficient for the particular undertaking, and with the knowledge that what has been contributed in the form of capital and resources is the usual measure and limit of the loss of the corporate membership.

The individual borrows from a need springing from his own personal necessities, but the corporation becomes a borrower from a corporate exigency. Although popular prejudice against usury subsists, the progress of society has brought about the general use of corporate enterprises in all forms

of commercial activity, and a general recognition of the economic truth that the volume of borrowing for commercial purposes through corporations has gradually become of surpassing importance in comparison with the borrowing for purposes of necessity by the individual; and that usury laws, particularly with respect to business affairs, increase the value of money and are restraints on the natural flow and supply of capital to the prejudice of industry and commerce. Again, the loss of the individual, singly or jointly, through usury, is at once both personal and immediate, but that of a corporation may or may not result in ultimate loss to its fluctuating membership, and, therefore, while the corporate loss is immediate to the corporation, it is both mediate and proportional among the corporate membership.    Moreover, the average corporation possesses more capital than the average man or unincorporated combination of men, and the greater the capital the less is the chance of serious loss in any undertaking for which borrowing is necessary.

It may well be that the Legislature concluded that a borrowing by a corporation for corporate purposes was distinguished by quite plain and practical considerations of public policy from a borrowing by an individual for his personal needs, even though financial embarrassment in both the individual and corporate debtor would be indicated by the usury demanded; and that the more legitimate object of a usury statute is the protection of the public rather than the mediate protection of the shareholders of a corporation. *Morawetz on Private Corporations,* secs. 667 and 668.

The courts of other jurisdictions have recognized the validity of the classification involved in the Maryland statute, and we are in accord with their conclusion because it is the weight of authority and the just application of sound principles of constitutional law.    2 *Machen on Corporations,* sec. 1694.

6.    The result of the constitutionality of section 131 of article 23 of Bagby's Code "is to leave lenders and corporate borrowers free to agree upon any rate of interest above the

regular limit," and guarantors and sureties on the obligations of corporate borrowers bound to the extent of the principal obligation and without any right to set up usury as a cause of action or a defense at law or in equity.  *Penrose v. Canton National Bank,* 147 Md. 200, 206, 209, and cases therein cited; and *Griffith v. Connecticut,* 218 U. S. 563; *State v. Hurlburt,* 82 Conn. 232; *Smoot v. People's etc. Assn.,* 95 Va. 686; *Mutual Loan Co. v. Martell,* 222 U. S. 225; *Webb on Usury,* secs. 301, 249.

The conclusion of the Court, that the mortgage in the instant case can neither be cancelled nor its foreclosure enjoined on the theory of the mortgage being usurious, will result in an affirmance of the decree.

*Decree affirmed, with costs to the appellees.*