NATIONAL ENAMELING & STAMPING COMPANY, Appellant, v. CITY OF ST. LOUIS.—40 S. W. (2d) 593.

Division Two, July 3, 1931.

*George Barnett* and *Thomas P. Moore* for appellant.

650

*Julius T. Muench* and *Richard S. Bull* for respondent.

COOLEY, C.—Appeal by plaintiff from judgment upon a directed verdict in favor of defendant. The case comes to the writer on reassignment.

This action was filed in the circuit court of the City of St. Louis to recover certain amounts paid by the plaintiff to said city for the use of water in excess of the amounts lawfully due defendant under the ordinances in effect at the time. The suit was based upon plaintiff's claim that it was entitled to use water at the manufacturer's meter rate and that plaintiff actually paid for water used under the general meter rate; that an ordinance was in force to the effect that in the event the amounts charged for water were not paid the proper

officer of the city might shut off the water; that plaintiff was dependent upon the water furnished by the city for the conduct of its business and that the payments were therefore compulsory and not voluntary.

The petition is in seven counts. Payment for water was made for each six-month period in advance, and the seven counts of the petition are for seven different periods of six months each, running from June 1, 1917, to December 1, 1920.

The applicable ordinances of the city of St. Louis were pleaded and offered in evidence. By these ordinances it was provided that consumers supplied with water at meter rates should be required to deposit in advance an amount sufficient to pay at the established rate for the estimated quantity of water to be used in the succeeding period of not to exceed six months, and further, that it should be the duty of the collector of revenue to notify the water commissioner of the non-payment of water bills within fifteen days after the same became due, and the water commission was authorized to shut off the water for the non-payment of bills upon being so notified that such bills had not been paid.

The defendant's answer to each count of the petition was the same. After a general denial it admitted the ordinances in question and alleged that a letter written by plaintiff in answer to one of defendant's amounted to a declaration on the part of plaintiff that it was not using water for manufacturing purposes, that the payment made therefor was a voluntary one and that plaintiff was estopped by reason of said letter from making the complaint set forth in its petition. It further set up that prior to the commencement of the suit the parties had compromised, settled and adjusted all claims for overcharge.

At the trial it was admitted by written stipulation covering each count of the petition that the ordinances were in force during the time involved and that plaintiff was authorized to use and did use water furnished by defendant at meter rates; that the assessor and collector of water rates of defendant charged plaintiff at a general meter rate set forth in each count in the stipulation; that the amount of water used by plaintiff was in excess of the minimum amount required to be used by one entitled to the manufacturer's rate, and for each count the amount actually paid by plaintiff at the general meter rate. the amount that would have been paid under the meter rate for purely manufacturing purposes, and the excess of the former over the latter amount was stipulated. The aggregate of these last amounts which the plaintiff would be entitled to recover if it prevailed in the action amounted approximately to $8,000.

Plaintiff offered but one witness, Mr. Ackerman, who was its master mechanic during the time involved and whose duties, according to his testimony, "included control of the water used in the plant,"

and whose business it was to know what the water was used for and how much was used. His testimony on direct examination tended to show that during the period involved plaintiff used a quantity of water for manufacturing purposes as defined in the ordinance such as to entitle it to the manufacturer's rate which it claims it should have paid.

On cross-examination he testified that during the years 1917 to 1920 inclusive, he did not know how the bills for water were computed or paid, nor what rates were charged, nor what rates were prescribed by the city ordinances; that *some time in 1921* the manager asked him "to look into it," which he then did; that prior to 1921 he had not checked the water bills, it not being his duty.

"Q. You would be the one, wouldn't you, who would check up on the consumption from 1917 and thereafter? A. Well, I have done it a great deal since then. I suppose it was, but I wasn't told to do it. Not until 1917. It seems like about the first part of the year, probably the spring of the year. I couldn't mention exactly what month. Before that time the officials of the company had never come to me and told me that they thought they were being charged too much. At no time from 1916 to 1920, inclusive, did I take up with any city official an adjustment of the water rates. We had no manager from 1917 to 1920 . . . I don't think it was ever taken up in that time. I do not think it was."

The witness further stated that prior to 1921 he did not know of any ordinance authorizing the water commissioner or any other city official to shut off the water of a consumer; that he had had a conversation with the company's attorney "about the subject-matter of this suit" in the spring of 1921, but had never discussed it with him prior to that time.

On behalf of defendant, Robert Ecoff testified that he was deputy collector in charge of collection of water rates and familiar with the manner in which the records were kept; that notices of amounts due were generally sent out by the assessor; that if bills were not paid "we would notify the water commissioner the bill wasn't paid," and that as a rule turning the bills over to the water commissioner "had the desired effect."

William T. Kircheis, supervisor of water rates, testified that when they had any idea a customer was in the manufacturing business they sent letters requesting certain information, and he identified a letter written to plaintiff April 13, 1916, and plaintiff's answer, dated April 19, 1916, written for plaintiff by Mr. Gaibe (still in plaintiff's employ at the time of the trial)', which letters were introduced as defendant's exhibits A and B respectively and were as follows, omitting captions:

Exhibit A. "Kindly advise if you maintain a manufacturing plant at the above premises, if so what is your product and in what way

is water used in your process of manufacturing outside of heat, power, toilet and drinking purposes.

"A prompt reply to above would be appreciated, as this information is necessary before making up your next bill."

Exhibit B. "In reply to your letter of the 13th instant would say we have a manufacturing plant at 3400 N. 2nd St. (2nd & Destrehan), where we make sheet iron, pails, tubs and stovepipe.

"We use city water in our boilers and for toilet and drinking purposes, for other purposes such as pickling and toilets out in the plant we use water from our own waterworks.

"Trusting this is the information required, we are," etc.

It should be stated here that according to the above letter, Exhibit B, plaintiff was not then entitled to the manufacturing rate. About February, 1917, it abandoned its own waterworks system and adopted the use of city water, but did not notify the city water department of the change. If the city had any notice, so far as shown, it was implied notice from the fact that at plaintiff's request its boilers were sealed by the city's boiler inspector who was not connected with the water department.

Mr. Kircheis further testified that he handled applications for special manufacturer's rates, many of which were received, and that aside from plaintiff's letter above he did not know what use plaintiff was making of the water.

In rebuttal the plaintiff introduced the seven water bills which had been sent to plaintiff. On each appeared a statement of the quantity of water used "this period" and amount therefor "at —— rate (see other side)," with other data and the following: "If not paid by —— water will be shut off. Request for adjustment of bill must be made not later than —— at Water Works Office, Room 100, City Hall." On the back of each bill was a statement or schedule of the general meter rate and also of the special rate for manufacturing purposes.

At the close of the evidence the court gave an instruction in the nature of a demurrer to the evidence and directing a verdict for defendant. Verdict and judgment for defendant followed.

The decisive question in the case is whether the payments sought to be recovered were made under duress, as plaintiff asserts, or were in the legal sense voluntary. The evidence makes a submissible showing that plaintiff was entitled to the special manufacturing rate and that it was dependent upon the city for water without which it could not carry on its business. The city had power to shut off plaintiff's water supply and to refuse to furnish it water upon plaintiff's refusal or failure to pay a rate demanded therefor. It is conceded that plaintiff was charged and that it paid the general meter rate which was higher than the manufacturing rate. If such payment was made by plain-

tiff because of compulsion from the necessity of the situation and in order to be permitted to continue its business, it was involuntary and plaintiff would be entitled to recover the excess sued for. [American Brewing Co. v. St. Louis, 187 Mo. 367, 86 S. W. 129; St. Louis Brewing Assn. v. St. Louis, 140 Mo. 419, 37 S. W. 525; Westlake & Button Co. v. St. Louis, 77 Mo. 47.] If, therefore, the evidence favorable to plaintiff, with such favorable inferences as may reasonably be drawn from the facts shown, would authorize a finding that the payments were made *because of such compulsion* the instruction directing a verdict for defendant should not have been given.

On the other hand, it is well established that payments to which the payee was not entitled but which were made by the payor under a mistake of law or in ignorance of the law are not considered as made under duress and are not recoverable. [American Brewing Co. v. City of St. Louis, supra; Ferguson v. Butler County, 297 Mo. 20, 247 S. W. 795.] The rule is thus stated in 48 Corpus Juris, p. 755, Section 312:

"Except where it is otherwise provided by statute, it is held by the great preponderance of adjudged cases that, where one under a mistake of law, or in ignorance of law, but with full knowledge of all the facts, and in the absence of fraud or improper conduct upon the part of the payee, voluntarily and without compulsion pays money on a demand not legally enforceable against him, he cannot recover it back; . . ."

To render a payment recoverable as having been made under duress there must have been something more than the mere existence of a potential power in the payee to compel payment. The existence or the exercise or threatened exercise of such power must have operated on the mind of the payor to induce the payment. "Duress" connotes the condition of mind of the wronged person at the time of the act sought to be avoided rather than the means by which such condition was produced. [Bouvier's Law Dict., Rawles 3d Revision, p. 961, citing Galusha v. Sherman, 105 Wis. 263, 81 N. W. 495, 47 L. R. A. 417.] And that the compulsion must have furnished the motive for the payment sought to be recovered, see 21 R. C. L. 145, sec. 169; Brumagim v. Tillinghast, 18 Cal. 265, 79 Am. Dec. 176. In the Brumagim case the court, speaking to this point, well said:

"The illegality of the demand paid constitutes of itself no ground for relief. There must be, in addition, some compulsion or coercion attending its assertion, which controls the conduct of the party making the payment. It is the compulsion or coercion under which the party is supposed to act which gives him a right to relief. If he voluntarily pay an illegal demand, knowing it to be illegal, he is, of course, entitled to no consideration, and if he voluntarily pay such demand in ignorance or misapprehension of the law respecting its validity, he is in no better position, for it would be against the

highest policy to permit transactions to be opened upon grounds of this character.''

Applying the well established principles above stated we think plaintiff's evidence failed to show that payment was made under duress. It knew the facts. The bills submitted by the city showed the quantity of water consumed and the sum charged therefor and showed also the general meter rate and the manufacturing rate. Mathematical computation would show that the rate charged was the general meter rate. Moreover, appellant makes no contention that it paid under mistake as to the facts. Its suit is upon the theory of compulsory payment. In view of the letters, defendant's exhibits A and B, and the fact that plaintiff never made any protest nor requested an adjustment of bills or rates, it could not be and is not contended that the city was guilty of any fraud, improper conduct or concealment. Plaintiff offered but one witness. That witness did not know, during the time involved, the ordinance rates for water nor that there was any ordinance authorizing the shutting off of water if bills were not paid. Nothing was said to him by any of the officers of plaintiff company indicating that they were better informed. If not, obviously, payment was not made because of any threat, actual or implied, that otherwise the water would be shut off.

Appellant calls attention to the notice printed on the bills rendered that ''if not paid by —— water will be shut off.'' That was a printed form and no time or date was inserted in the blank space. The quoted statement was accompanied by the further statement ''request for adjusment of bill must be made not later than —— at,'' etc., plainly indicating that such request, if made, would receive consideration. If the entire statement on the bills, read together, can be construed as a threat that the water presently would be turned off if payment were not made promptly, the evidence does not indicate that it was a motivating factor in causing plaintiff to pay.

Plaintiff's evidence does not indicate that any request for adjustment or any protest was ever made. Defendant's evidence was that the first complaint or protest was by a letter dated November 29, 1920, after the payments here in dispute had been made. Defendant offered to prove that thereafter plaintiff was charged the special manufacturing rate but on plaintiff's objection that offer of proof was rejected. Granting that a formal protest is unnecessary where it would manifestly be unavailing, the failure to protest or make any objection may in some circumstances have significance in determining whether or not payment was made voluntarily. In this case the only witness for plaintiff was ignorant of the applicable ordinance rate and of the ordinance provision authorizing the shutting off of the water if bills were not paid. From aught that appears in the evidence the officers of plaintiff company may have been equally uninformed. The fact that plaintiff's manager in 1921 for the first

time asked Mr. Ackerman "to look into" the matter and that about the same time plaintiff's attorney for the first time discussed "the subject-matter of this suit" with the witness who had "control of the water used in the plant," during the period covered by the payments, together with the fact that no protest or request for adjustment of bills or rate had been made, points strongly to the conclusion that not until about that time did plaintiff realize that it had any complaint to make and that it paid the bills without compulsion, either because it carelessly failed to note, though with the facts and data before it, that it was paying a higher rate than it should have paid, or was ignorant of the rate to which it was entitled.

The court could not assume that the payments were coerced merely because under the existing conditions compulsion could have been applied. Nor could the jury properly have so found. Plaintiff sought recovery on the theory that it had paid under duress, that is, because it was forced to do so in order to preserve and continue its business. The burden rested upon it to make out its case. [Douglas v. Kansas City, 147 Mo. 428, 441, 48 S. W. 851.] The Douglas case is illustrative. The suit was to recover license taxes paid to Kansas City by a number of saloonkeepers located in territory the annexation of which to Kansas City was subsequently held invalid, wherefore the collection of the license tax by Kansas City was illegal. Some of the payments involved had been made under threats of arrest and were held to have been involuntary and for them recovery was allowed. Of others, equally illegal, for which recovery was denied, the court said:

"No proof was offered of the circumstances under which these payments were in fact made. The only evidence presented in regard to the matter was as to the practice of the license inspector. He stated, in a general way, that he visited the people engaged in business in that territory, got their names, and reported them to the proper officer, so that they might be prosecuted if they failed to pay. Blank notices were sent to all parties, requiring them to take out licenses, and stating that they would be arrested, if they failed to do so within the time named in such notices. This was the general character of the evidence. It is needless to go more into detail. The burden was on plaintiff to make out his case. This was not done by simply showing that the taxes were paid to the city. They may have been voluntarily so paid, and in that event there can be no recovery . . . For aught shown by the testimony, they (the payors) may have believed the extension valid, been satisfied with it, and voluntarily paid their taxes."

Appellant cites and relies upon three cases: Westlake & Button Co. v. St. Louis, supra; St. Louis Brewing Assn. v. St. Louis, supra, and American Brewing Co. v. St. Louis, supra. In the Westlake & Button Company case the plaintiff paid the excessive rate illegally

exacted as a *dernier resort* and in order to prevent destruction of its business, after protest and unavailing efforts to have the illegal excess abated. So in St. Louis Brewing Association v. St. Louis where the plaintiff paid because compelled to do so or suffer the water to be cut off and its business damaged. While the agreed statement of facts upon which that case was submitted is not set out, though referred to, in the opinion, the opinion shows (140 Mo. 1. c. 423) that such was the fact. We have examined the original files of that case in the office of the clerk of this court and find that in the agreed statement of facts referred to in the opinion it was agreed, among other things, that the plaintiff was entirely dependent upon the city for water for the carrying on of its business and at all times was willing and offered to pay the rate which it should have paid but that the city officials refused to accept that amount and demanded and exacted the higher rate and threatened to shut off the water and to refuse plaintiff further use of water unless such demanded rate was paid, and that payment was made under protest in order to prevent such threat from being carried into effect.

American Brewing Co. v. St. Louis, supra, was ruled upon a demurrer to the petition which had been sustained below. The court, after referring approvingly to the principles announced in the Westlake & Button Co., and the St. Louis Brewing Assn., cases, said the question for determination was whether the petition stated facts sufficient to bring the case within the rule as to payments "made as a condition to its (plaintiff's) right to continue its business." By considering, with other allegations of the petition, those showing the plaintiff's dependence upon the city for water and that the defendant city *demanded and exacted* the excessive rate and required plaintiff to pay for the water license for six months in advance, together with "all the inferences of fact that may fairly and reasonably be drawn from the facts pleaded," the court reached the conclusion that the petition sufficiently stated a cause of action as against a general demurrer.

In the American Brewing Company case the court was not discussing the sufficiency of the evidence to prove the case stated in the petition, which is the question involved here. The statement that the question on the petition was whether it stated sufficient facts to bring the case within the rule as to payments made *as a condition* to the plaintiff's right to continue its business indicates that the court had in mind the thought we have endeavored to express, viz., that in order to be recoverable as having been made under duress, the payment must have been made involuntarily and because it was compelled by the defendant's demand and the plaintiff's necessity. We find nothing in that decision which in our judgment militates against the views herein expressed.

In our opinion there was a failure of proof of an essential element of plaintiff's case and the court therefore properly sustained the demurrer to the evidence.

The judgment is affirmed. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.