WALK-A-SHOW, INC. *v.* ROBERT F. STANTON ET AL.

[No. 40, October Term, 1943.]

*Decided December 15, 1943.*

The cause was argued before SLOAN, C. J., DELA-
PLAINE, COLLINS, MARBURY, GRASON, MELVIN, ADAMS,
and BAILEY, JJ.

*Roszel C. Thomsen,* with whom were *Clark, Thomsen &
Smith* on the brief, for the appellant.

*Hall Hammond, Deputy Attorney General,* with whom
was *William C. Walsh, Attorney General,* on the brief
for the appellees.

MELVIN, J., delivered the opinion of the Court.

The sole question involved in this case is whether
money paid as license fees by the appellant, under the
purported authority of a statute which was subsequently
declared to be unconstitutional, was paid under duress
or whether it was paid voluntarily under an honest mis-
take of law. The statute in question is Chapter 269 of
the Laws of 1900, codified as Section 942 of the Charter
and Local Laws of Baltimore City, 1938 Edition. It
provided, in substance, that no public dances, soirees,
etc., "or other public entertainment of like kind" should
be held in the City of Baltimore except upon condition
that a license or permit fee of not less than $5 nor more
than $100 first be paid to the Secretary of the Police
Commissioner, irrespective of any permits authorized,
issued or collected by the authority of the Mayor and
City Council of Baltimore. It further provided that any
person or corporation violating the provisions of this
section should be subject to a fine of not less than $5
nor more than $100.

In June and July, 1940, appellant conducted a non-
stop dance contest, known as a "walkathon," in the City

of Baltimore, and as license or permit fees was called upon to pay, and did pay, a total of $4,405. These fees were imposed by the appellees under the statute above mentioned and were in addition to a fee of $50 which appellant paid for a permit from the Mayor and City Council. It claims that this latter fee was all that was legally necessary and that the other was not chargeable to it. Appellant did pay it, however, in the form of remittances from day to day—$100 for the first forty-four days and $5 for the last day—and the circumstances under which the payments were made present the single issue to be determined here. It is one of fact, for al-though what constitutes duress is a matter of law, whether it exists in the particular transaction is a matter of fact depending on the situation of the parties and all the surrounding circumstances. *Winget v. Rockwood,* 69 F. 2d 326; *Bartlett v. Richardson Co.,* 27 Ohio App. 263, 161 N. E. 403; *Coon v. Metzler,* 161 Wis. 328, 154 N. W. 377; *Cooley on Taxation,* 4th Ed., Vol. 3, 2566; *Jones v. Sherwood Distilling Co.,* 150 Md. 24, 38, 132 A. 278.

This case was submitted to the trial judge under Rule 9, Part Three, III, of the General Rules of Practice and Procedure adopted by this court in 1941 and the trial was upon the facts as determined by him, without a jury. According to sub-section "C" of the rule, the appellate court "may review upon both the law and the evidence, but the judgment of the trial court shall not be set aside on the evidence unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." The burden was upon the plaintiff (appellant) to establish to the satisfaction of the trial court that the payments in question were made under "duress." It failed to meet this burden and a judgment for the defendants resulted, from which the present appeal was taken.

In reviewing the evidence we find not only that "duress" is not proven by the two witnesses offered by the plaintiff, but that they, themselves, show the absence

of it. These witnesses were the attorney and assistant treasurer, Harry M. Berman, of Baltimore City, and its principal stockholder and chairman of the board, George L. Ruty, of Atlantic City, both men of experience in their line of business—commercialized public entertainment. Ruty, who also operated bingo games on the boardwalk at Atlantic City, testified that his business has been "general amusements for the past twenty years, entertainment." Berman has been a member of the Bar since 1920, and had been attorney for the Rutys for four years prior to 1940. The only other person mentioned as having any connection at all with appellant was George L. Ruty's brother, William, who was a silent or negative factor in the enterprise, and was not a witness in the case.

The Rutys had conducted a walkathon in Baltimore in 1937 at this same general location, the Philadelphia Road, but had not been called on then to pay for any license other than the one obtained from the Mayor. In the meantime, the appellee, Robert F. Stanton, had taken office as Police Commissioner and had obtained an opinion from the Attorney General of Maryland as to whether or not the statute above mentioned, Chapter 269 of the Laws of 1900, applied to walkathons. The Attorney General advised that it did apply (24 *Op. Atty. Gen.*, 640), and this opinion was in hand when the appellant appeared in the spring of 1940 as a prospective operator in this field.

In view of the Police Department's previous unsatisfactory experience with another walkathon (not the Rutys', however), reported to him after he assumed office, the Commissioner had determined to charge all walkathons thereafter the maximum fee of $100 per day as allowed by the applicable statute. He so notified another applicant, the manager of the Coliseum in Baltimore City, who proceeded no further after this ultimatum. He also caused notice to be sent, through his secretary, to appellant when it appeared on the scene the following year.

Appellant's attorney, Berman, had an interview with the defendants about two days before the walkathon began operations in June, 1940, and protested vigorously the amount of the fee. His own testimony is that at that same interview he also questioned the constitutionality of the law under which the fee was imposed. This, however, was flatly denied by both the Commissioner and his secretary, who testified that no discussion of this question ever took place. Mr. Berman acknowledged that he had studied the ordinance "at various times" and "definitely felt that if ever taken into court it would be declared unconstitutional." He testified further that he was not certain whether he was familiar with the Attorney General's ruling, but he did feel after the Mayor had given the permit "that that was all that was necessary."

For several weeks prior to the interview with Judge Stanton, Mr. George L. Ruty, operating out of Mr. Berman's office, had made extensive arrangements for holding this walkathon and by the time of the interview had laid out approximately $6,000 and contracted for many thousands more. That was the situation in which appellant had placed itself when its officers locked horns with the Police Commissioner over the matter of this license fee. At that time the statute in question, Chapter 269 of the Laws of 1900, had been in full force and effect for forty years without question as to its validity or constitutionality. That its provisions applied to walkathons had been settled for the Commissioner by the opinion given by the Attorney General in August, 1939.

In the face of the above facts, the course of action taken by appellant's officers is most significant and is conclusive of the issue of duress. The payments were made in the form of checks payable each day for forty-five days to the order of the Baltimore Police Department. None had any notation as to protest or objection, and there was nothing to that effect in writing at any time. The only testimony on the subject of a protest

was that offered by appellant's two witnesses, Berman and Ruty, and had to do exclusively with their interviews with the Police Commissioner which took place in the office of his secretary shortly before the walkathon began operations, and it was then, Berman testified, that he questioned the constitutionality of the law. This, as above stated, was denied by both of the appellees.

Mr. Ruty, appellant's only other witness, testified that at his own meeting with the Commissioner he told him "we will pay the $100.00 a day but we will pay it under protest, and we are going to sue you after the contest is over." The Commissioner's testimony on that point was that "never, never was a word of that kind ever uttered by anybody, either by Mr. Berman or Mr. Ruty." The witness then continued: "and it seems to be if they had such a program in mind on this matter, with the importance of what they say now took place, they would have taken the precaution to have some writing confirming or indicative of that fact, but I say, positively and absolutely, nothing of that sort was ever mentioned either by Mr. Berman or by Mr. Ruty."

All the witnesses agree on one point, and that is that appellant's witnesses both vigorously protested against the amount of the fee, and that repeated efforts were made to have it reduced. Judge Stanton testified that the only interview he ever had with Mr. Ruty was one in which the latter sought to have the fee reduced to $50 a day, and that this interview took place some time after the walkathon had gotten started. Mr. Berman admitted that "yes, we tried to make a deal." This witness also testified, as did Mr. Ruty, that the Commissioner had told them that if they did not pay the fees required, he would arrest every person in any way connected with the walkathon, including "the contestants, the performers, the officers of the organization and everyone on the premises." The Commissioner's denial of this is embodied in his testimony that "not one word was ever said about any threat of any action in the Court."

Out of all these contradictions as to protesting the constitutionality of the law, the one outstanding fact that

emerges is that at the time the payments were made there was no protest of any kind, written or otherwise. The walkathon concluded its operations in Baltimore on July 25, 1940, and no claim was made for a refund of any of the daily payments, aggregating $4,405 until two years thereafter when this suit was brought in August, 1942.

In the meantime, this statute (Section 942 of the Baltimore City Charter) was declared unconstitutional by this court in a case entirely unrelated to the present action, and decided on March 3, 1942. *Maryland Theatrical Corporation v. Brennan,* 180 Md. 377, 24 A. 2d 911. Questioned as to his delay of two years in bringing this suit, when he had previously said that he would sue the Police Commissioner "after the contest is over," the witness George L. Ruty's reply was "that was my privilege," and he repeated this answer when asked again "why did you wait several years?"

The aforegoing recital of facts shows conclusively a complete absence of duress or compulsion in the payment of the disputed license fees. The appellant's officers, Ruty and Berman, were experienced men of affairs, especially in the matter of licenses, and were not the kind who would hand over $4,405 "under protest" and with a pre-conceived plan to sue for a refund, without taking the elementary precaution to accompany the payments with some written evidence amounting to a reservation of rights.

According to Mr. Berman's own testimony, his professional opinion as attorney for appellant was that, after he had gotten the permit from the Mayor, "that was all that was legally necessary." He still held to that opinion after giving further study to the matter before he went to see the appellee, Brennan. Both he and Mr. Ruty concentrated on the effort to get the amount of the fee reduced and, failing in that, the way was wide open to them to act on Mr. Berman's opinion that the statute, under which they were about to be required to pay, was unconstitutional and void. It was even suggested to them by the Commissioner himself

that the matter could be tested through injunction proceedings, which happened to be the very procedure under which the Act was later declared unconstitutional by this court.

However, in spite of all these opportunities for seeking relief, appellant availed itself of none, but chose to abide by the law as it then stood. This law permitted the Commissioner's secretary to exact a maximum fee of $100 and, while appellant's officers considered the amount exorbitant and oppressive, they paid it and kept on paying it from day to day, and without any question whatsoever as to the constitutionality of the law.

"Duress" is a condition of mind produced by improper external pressure or influence that practically destroys the free agency of the party against whom it is brought. 14 *Cyc., Duress,* 1123; *R. S. Jacobs Banking Co. v. Federal Reserve Bank of St. Louis,* Mo. App., 34 S. W. 2d 173; 48 *Corpus Juris, Duress,* 743. Here, the testimony shows, appellant's attorney, Berman, had made up his own mind and formed an opinion on the subject in controversy, and had done so in ample time before payment to have had his professional opinion tested in court, and thus to have avoided the consequences if an adverse ruling had resulted. However, instead of following that course, he and his client, Ruty, deliberately and freely chose to take their chances in trying to make a "deal" with the Police Commissioner on the amount of the fee. When that effort failed, what was in their mind is plainly indicated by what they actually did and, even more significantly, by what they failed to do. They paid, and they did not protest when doing so. If there had been any question in the minds of the payor's officers that it would not have to pay at all, it is incredible that these two experienced men of affairs would have failed to take the ordinary and very simple precaution of making some sort of reservation of rights as and when the payments were made. Their course of action in this particular alone is sufficient to support the judgment rendered by the trial court.

It is axiomatic that ignorance of the law excuses no one. Especially, it does not excuse a member of the Bar who, in the line of his professional employment, admittedly makes a study of a law which affects his client's rights, participates in the payment of fees thereunder, without legal protest, and then seeks to recover them back on the theory that the law was unconstitutional and void at the time of payment. As stated in *Cooley on Taxation,* 4th Ed., Vol. 3, p. 2565: "Every man is suppose to know the law, and if he voluntarily makes a payment which the law cannot compel him to make, he cannot afterward assign his ignorance of the law as a reason why the State should furnish him with legal remedies to recover it back." Again, this same authority, at page 2566, points to the necessity of making a reservation of rights at the time of an unwilling payment in order to support a suit for a refund. "Nor is the mere fact that a tax is paid unwillingly, or with complaint, of any legal importance, but there must be in the case some degree of compulsion to which the taxpayer submits at the time, with a notification of some sort equivalent to reservation of rights."

Payments made under a mistake of law or ignorance of law are not recoverable as made under "duress." *National Enameling & Stamping Co. v. City of St. Louis* 328 Mo. 648, 40 S. W. 2d 593; *Baltimore City v. Harvey,* 118 Md. 275, 84 A. 487; *Lester v. Baltimore,* 29 Md. 415, 96 Am. Dec. 542; *Baltimore v. Lefferman,* 4 Gill 425, 45 Am. Dec. 145; *Baker v. Baker,* 94 Md. 627, 51 A. 566.

The only possible theory on which the plaintiff (appellant) could recover in this case is that of its own non-belief in the validity of the statute under which payment was demanded. As the evidence clearly shows that its officers acted on the contrary belief as free agents, there was no duress, but simply a case of making payments under an honest mistake of law. That being the judgment of the trial court, it will be affirmed.

*Judgment affirmed, with costs.*