## THOMAS H. MAGNESS, ET UX. v. LOYOLA FEDERAL SAVINGS & LOAN ASSOCIATION

[No. 147, October Term, 1945.]

570

*Decided June 12, 1946.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Maurice W. Zetlin,* with whom was *George B. Petite* on the brief, for the appellants.

*Edward A. Smith,* with whom was *Cornelius P. Mundy* on the brief, for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from an order sustaining a demurrer to a second amended bill for discovery and accounting, without leave to amend. The Court was advised that there were no new or additional facts which the complainants (appellants) desired to show by further amendment. Though the order does not in terms dismiss the bill, it is in order in the nature of a final decree and is appealable. *McNiece v. Eliason,* 78 Md. 168, 174, 175, 27 A. 940; *Hendrickson v. Standard Oil Co.,* 126 Md. 577, 582, 95 A. 153; *Maas v. Maas,* 165 Md. 342, 345, 168 A. 607.

On June 14, 1929, complainants executed a mortgage to the defendant (appellee) on leasehold property, No. 14 East Read Street, in Baltimore. The mortgage recites that complainants, "being members" of defendant, have received from it "an advance of $12,000 on 96 shares of stock standing in their names, being the full par value of said 96 shares * * * when fully paid up and completed, and in order to secure the full payment and completion of said shares * * * in accordance with the Constitution and By-Laws" of defendant the mortgage is executed. If complainants "shall perform the covenants herein on their part" the mortgage shall be void. Complainants covenant, *inter alia,* to pay every week [1] "25 cents as dues" on each share "as provided by the Constitution and By-Laws," [2] 15 cents on each share "as interest or compensation" to defendant "for the advance made," and [3] a sum to create a fund for payment of ground rent, water rent and taxes; "all of which" payments and covenants shall continue "until the weekly dues aforesaid and the *pro rata* dividend of profits" of defendant "to which said shares shall be entitled shall have fully paid up and completed said shares of stock and a proportionate part

of any loss" defendant "may sustain before the completion of said shares." Article VIII, Section 1, of the by-laws provided that "the profits of the Association shall be ascertained semi-annually" as of the end of June and December, may be held for six months in the discretion of the directors, and "shall then be divided pro rata among all redeemed and free shareholders according to the amount that stood to their credit * * * when said profits were ascertained and which the holders thereof have not withdrawn in the meantime." Article VI, Section 3, provided for the weekly payments of "15 cents per share as innterest." Article II, Section 5, provided that "whenever in the case of redeemed shares the weekly dues paid by a member, together with the dividends thereon, shall amount to the sum of $125 for each share so redeemed, the property mortgaged * * * shall be released, and the party shall cease to be a member of the Association by virtue of such redeemed shares."

Defendant was originally incorporated under the laws of Maryland as a building association, Loyola Perpetual Building Association of Baltimore City. The bill alleges that in November, 1942, defendant "became Federalized," i. e., presumably, it "converted itself into a Federal Savings and Loan Association" under the Home Owners' Loan Act of 1933, as amended, as permitted by federal and Maryland statutes. Home Owners' Loan Act of 1933, as amended, Sec. 5 (i), U. S. Code, Title 12 Chapter 12, Sec. 1464 (i), 12 U. S. C. A., Sec. 1464 (i) ; Maryland Code of 1939, Art. 23, Sec. 173; *Hokpins Federal Savings Association v. Cleary,* 296 U. S. 315, 56 S. Ct. 235, 80, L. Ed. 251, 100 A. L. R. 1403. Neither the Federal Charter nor the by-laws are set out in, or filed with, the bill. The mortgage and complainants' pass books, two with the Maryland corporation (which contain its by-laws) and one with the federal corporation, are filed as exhibits with the bill. In the bill, at the argument and in the briefs, no provision of any federal statute, rule or regulation was mentioned or referred to, and no right or defense was asserted on the basis of any such provision.

Both parties have assumed that the questions raised by them depend upon Maryland law in force at and since the date of the "advance" and the mortgage.

The bill alleges that payments were made regularly until the "financial depression," during which period complainants "fell back in their principal payments, but continued to pay the interest and expense account payments in such amounts as were required on the unpaid balance of said mortgage." The pass books show that: until March, 1931, both "interest" and "dues" were paid with substantial regularity, each interest payment being $14.40, *i. e.*, 15 cents each on 96 shares; from March, 1931, interest was paid at 15 cents a share, but irregularly, usually for two, three, four or eight weeks at a time; from April, 1934, until October, 1935, no interest at all was paid; from May, 1936, interest was usually paid in amounts larger than 15 cents a share, evidently on account of the back interest unpaid; from March, 1931, dues were paid in decreased amounts; from April, 1932, to February, 1942, none at all were paid, and from February, 1942, dues were paid in irregular amounts at irregular intervals.

The only regular credits towards "payment and completion" of the shares were dividends, in varying amounts (each less than interest at 6 per cent on dues paid in), every six months from December, 1929, to December, 1942, inclusive. The bill alleges that when defendant "became Federalized" in November, 1942, the federal pass book "does not show any dividends paid from that time on." The book does show a credit of $56.61 which (though not so designated) evidently was a dividend as of December, 1942. On May 10, 1943, the balance of $7,568.76 to "pay up and complete" the shares was paid and the mortgage released.

The bill alleges, with argumentative repetition, that: "On many occasions * * * complainants noted that the interest entries in said pass books were not properly credited, in that [defendant] continued to charge * * * interest at * * * more than six per cent * * * on the original

borrowed amount of $12,000 without giving * * * credit
* * * in the computation of said interest, of the principal
payments made by * * * complainants, which payments
constantly reduced the original amounts borrowed * * *;
when * * * complainants continuously brought this to the
attention of the officers and representatives of [defend-
ant], they * * * were unable to secure a satisfactory ex-
planation of this improper method of accounting * * *.
This unsatisfactory situation continued until May 10,
1943, when * * * complainants, not securing from [de-
fendant] the proper credits due them * * *, were com-
pelled to undergo expense in securing another mortgage
loan from another association, in order to pay off, under
protest, the then balance claimed by * * * defendant, * * *
$7,568.76," which "complainants were forced [to pay],
under threat of foreclosure of the mortgage." "Com-
plainants and their solicitor have since requested an ac-
counting from * * * defendant, as to these overcharges,
but * * * have not received the same, the position taken
by * * * defendant being, that since some dividends de-
clared by [defendant] had been credited to * * * com-
plainants' account, * * * complainants were shareholders,
and were therefore chargeable with interest on the full
original amount of $12,000 borrowed * * *, without * * *
credit [for] all principal payments made by them."
Complainants "contend that they are entitled to * * *
credits of all principal payments made by them * * *, in
the determination of the actual interest due on said mort-
gage loan, and that * * * failure * * * to properly credit
said payments * * * produces a situation whereby they
have been charged interest at * * * more than six per
centum * * * on the original amount of $12,000 borrowed
* * *, during the entire period * * * from the date of bor-
rowing * * *, June 14, 1929, to the date of payment of
said mortgage * * *, May 10, 1943, without allowing * * *
complainants any interest credits on all principal pay-
ments made by them, except some dividends credited
* * *, which dividends, in amount, are far inferior to the
interest credits to which they are entitled."

The bill also alleges that: "Complainants have no way of determining whether" "the various credits for dividends set forth on said pass books" "are all the dividends to which * * * complainants are entitled * * * or whether they are based on profits and losses sustained by * * * defendant, * * * since the determination" of "the various amounts so set forth" "and the figures, facts, records and books containing same are entirely within the sole possession of * * * defendant and are not accessible to * * * complainants * * *; complainants had requested of * * * defendant these facts and figures, but * * * defendant has failed and refused to furnish * * * complainants with the same, and such records, facts and figures are not obtainable elsewhere. * * * complainants * * * never had an opportunity of determining whether the dividends allowed were the proper dividends paid to all other borrowers and free shareholders, similarly situated * * *; complainants were not real and *bona fide* stockholders of * * * defendant * * *, and * * * under the law they could not have participated in the affairs of the corporation as full fledged and *bona fide* stockholders on the basis of the 96 shares which they were alleged to have purchased, in that, as each share was redeemed and when all shares were finally redeemed they no longer were members or stockholders of said corporation. * * * it is * * * believed and therefore averred by * * * complainants that Article 8, Section 1, of the by-laws of defendant * * * were not complied with, nor did * * * complainants receive the proper credits to which they were entitled."

The bill prays (1) discovery "in detail [of] all sums * * * received from * * * complainants * * * on account of their mortgage transaction," from June 14, 1929, to May 10, 1943, and "all records and figures necessary to properly ascertain whether the dividends declared and credited during that period constitute the entire number and amount of dividends to which complainants are entitled, [and] the profits and losses, if any, during the * * * period, obtained and sustained by * * * defendant, which would ordinarily determine the amount and num-

ber of such and similar dividends," and an accounting "with * * * complainants for all their interests in the business, issues and profits of * * * defendant's business during the * * * period," (2) payment of "all sums ascertained to be due" complainants "on account of said mortgage transactions" and (3) general relief. The original bill was filed March 22, 1944.

Although complainants say they were unable to secure a "satisfactory" explanation of the computation of interest, they show that defendant made clear to them how interest was computed and that the computation was based on the terms of the mortgage, *viz.,* the same 15 cents a share was to be paid every week until "payment and completion" of the 96 shares, and meanwhile complainants were to be credited with dividends earned—and consequently not with interest—on "dues" paid. Indeed, as complainants "noted," the entries in the pass books showed that interest was computed in this way. Likewise, although complainants say they have no way of determining whether the amounts of the dividends credited to them were proper, and they "believe and therefore aver" that they did not receive the proper credits, they show no basis for such a belief and no new information acquired by them since they made payment in full. The fact that dividends credited after the "crash" in 1929 were substantially less than 6 per cent. *per annum,* is no reason for suspecting the computation of earnings and dividends. If, however, they wished to contest the legality of the computation of interest or to learn the factual details of the computation of earnings and dividends, they had more than thirteen years, before payment, in which to file a bill for these purposes. Instead, with full knowledge of the facts (including the fact of their own lack of knowledge as to computation of dividends), they paid the full amount demanded.

Building association "advances" and mortgages of this kind are anomalous artificial legal transactions, but are not novel or unprecedented in Maryland. Rather, in practice, they already seem to be obsolescent. Whether

such contracts can lawfully be made by federal savings and loan associations we need not consider. See Federal Home Loan Bank Act, Sec. 5, U. S. Code, Title 12, Chapter 11, Sec. 1425, 12 U. S. C. A. Sec. 1425; Home Owners' Loan Act of 1933, Sec. 4 (f), U. S. Code, Title 12, Chapter 12, Sec. 1463 (f), 12 U. S. C. A. Sec. 1464 (f). In Maryland such mortgages have been authorized by statute since 1852 and sustained by this Court since 1857. Acts of 1852, Chapter 148; *Robertson v. American Homestead Association,* 10 Md. 397, 69 Am. Dec. 145. The Act of 1852 followed the statute of 6 and 7 William IV, Ch. 32, and this Court followed English cases under that statute. The Act of 1852 (with changes not now material) has been retained in legislation now in force. A building association may advance to any member the sum which he would be entitled to receive upon the maturity of his stock, or may purchase the shares of stock held by him, and may receive security, by mortgage, for the payment of the unpaid installments, to be paid on the shares so sold or redeemed, "together with interest at the rate of 6 per cent. *per annum* on the sum so paid or advanced." Code of 1939, Art. 23, Sec. 163. The payment of the unpaid installments on the shares so purchased or redeemed, "with interest on the money paid therefor," may be secured by mortgage on real or leasehold property. Art. 23, Sec. 164. *Cf.* Sections 6 and 7 of the Act of 1852.

These statutory provisions authorize the terms of complainants' mortgage, *viz.,* (a) computation of interest on the $12,000 advanced, without deduction (from the $12,000) of dues paid and (b) credit of dividends (on dues paid) against unpaid installments. The $12,000 advanced is not a loan or a mortgage debt, but an advance payment for complainants' stock; there is no covenant to repay it. The mortgage debt is the obligation to pay all unpaid installments, including dues and interest. If defendant earns dividends greater than 6 per cent., the ultimate net cost of money to complainants, after crediting dividends, will be less than 6 per cent.; if defendant earns les than 6 per cent., the net cost will be more than 6 per

cent. The latter contingency does not make the contract usurious, because the transaction "was not a loan of money but a dealing with a partnership fund, in which the person to whom money was advanced had an interest in common with the other members of the * * * association." *Carozza v. Federal Finance Co.*, 149 Md. 223, 246, 131 A. 332, 341, 43 A. L. R. 1. *Cf. Appeal Tax Court of Baltimore City v. Rice*, 50 Md. 302, 316-318. Computation of interest according to the terms of the mortgage is lawful, since complainants participate in the profits—or losses—of defendant's business. *O'Sullivan v. Traders' and Mechanics' Permanent Savings Association*, 107 Md. 55, 68 A. 349; *Stewart v. Workingmen's Building Association*, 106 Md. 675, 68 A. 887.

[a] Whether such computation of interest would be lawful if complainants did not participate in profits or losses, and [b] whether complainants (besides participating in profits and losses) could vote as stockholders, are questions which need not be decided. When the "stockholder" after redemption of his shares has no interest in profits or losses, the relation between him and the corporation "is simply that of mortgagors and mortgagee." *Watson v. Alice Anna Street Loan and Savings Association*, 158 Md. 339, 341, 148 A. 420, 421. A mortgage, which did not conform with the Act of 1852, was "regarded in the same light as if it were a mortgage between individuals, and apart from any law relating to Building Associations." *Baltimore Permanent Building and Land Society v. Taylor*, 41 Md. 409, 419. Such a transaction was "nothing more nor less than a loan of money * * * and a mortgage * * * for its repayment with usurious interest." *Williar v. Baltimore Butchers' Loan Association*, 45 Md. 546, 562, 563. Section 168 of Article 23 (which to this extent originated in an amendment in 1872 of the general corporation law of 1868) in effect duplicates and also expands the Act of 1852, [a] authorizing on the same terms either advances or "loans," and mortgages to secure "repayment * * * of the money loaned or advanced" and [b] providing that shares "so

redeemed, advanced, loaned or purchased" shall be cancelled and the holders shall cease to be stockholders and shall not be entitled to vote. Some of the terms of "loans" under Section 168, *e. g.*, as to premiums, fines and forfeitures, would not be lawful in respect of an ordinary loan between individuals. It has not been decided [a] whether "loans" under Section 168 may lawfully be made on all the same terms permitted, in case of advances, by the Act of 1852, [see *Watson v. Alice Anna Street Loan & Savings Ass'n, supra*], or [b] whether Article II, Section 5, of defendant's by-laws, making holders of "redeemed shares" members until completion of the shares, was invalid, as it would have been with respect to nonparticipating "stockholders." *First Mortgage Bond Homestead Ass'n v. Baker,* 157 Md. 309, 145 A. 876. Since 1945 even a "borrower" is a member, entitled to one vote. Acts of 1945, Chapter 875, amending Article 23, Sec. 172.

Complainants, recognizing that the Act of 1876 (Code of 1939, 1943 Supplement, Art. 49, Sec. 6, *Brenner v. Plitt* 182 Md. 348, 34 A 2d 853) bars suit to recover usury paid, disclaim any charge of usury—though the mortgage on its face is usurious to the extent that 15 cents a week for 50 weeks is exactly six per cent of $125, but for 52 weeks is 6.24 per cent. of $125 or 6 per cent. of $130. The difference between 52 weeks and a year seems to be disregarded on the principle *de minimis* (*Stewart v. Workingmen's Building Ass'n, supra; O'Sullivan v. Traders' & Mechanics' Permanent Savings Ass'n, supra*), but hardly the difference between 50 weeks and a year, between 6 and 6¼ per cent. Notwithstanding complainants' disclaimer of the name usury, the essence of their contention against the computation of interest under the mortgage is that it results in usury. Before the Act of 1876 usury paid could be recovered because the debtor was "considered in law *in vinculis*," and the payment therefore not voluntary. *Williar v. Baltimore Butchers' Loan Ass'n, supra,* 45 Md. 560. The Act of 1876 put payment of usury in the same status as any voluntary payment; it created no right to recover other voluntary payments.

The distinction between a voluntary payment and a payment under compulsion or duress has been different at different times and in different jurisdictions. Originally duress included only duress of the person, by imprisonment or threats. Later its scope has been enlarged, to a greater or less extent to include duress of property, which in turn may include "economic duress." Williston on Contracts (Revised Edition) Sections 1601, 1603, 1618. The conflict among authorities is mentioned by Williston and seems to be reflected in his review of them: "as foreclosure is a lawful means for securing a mortgagee's claim, threats of foreclosure do not amount to duress" (Sec. 1606, citing cases) ; "an unlawful refusal by a mortgagee to release the mortgage, unless he is paid a bonus, or a demand of an excess payment in order to prevent foreclosure, may also amount to duress" (Sec. 1618, citing cases, including *Kilpatrick v. Germania Life Ins. Co.,* 183 N. Y. 163, 75 N. E. 1124, a four-to-two decision, reversing a three-to-two decision which affirmed the trial judge). The Federal courts hold that ordinarily collection of an unlawful tax will not be prevented by injunction, because payment under protest and suit to recover is an adequate remedy at common law. *Elliott v. Swartwout,* 10 Pet. 137, 156-158, 9 L. Ed. 373; *Cary v. Curtis,* 3 How. 236, 246-252, 254, 255, 11 L. Ed. 576. *City of Philadelphia v. Collector,* 5 Wall. 720, 730, 732, 733; *Graham v. DuPont,* 262 U. S. 234, 254-258, 67 L. Ed. 965. This court has held that payment under protest, under threat and advertisement of sale, is a voluntary payment, because collection could be prevented by injunction. *Lester v. Mayor, etc., of Baltimore,* 29 Md. 415, 419, 420, 96 Am. Dec. 542; *cf. Baltimore v. City of Harvey,* 118 Md. 275, 285, 286, 84 A. 487. With respect to taxes, the Federal rule has been confirmed, and the Maryland rule frequently superseded, by statute.

In this case it is not necessary to draw a fine line. Protest or lack of protest may constitute evidence of the compulsory or voluntary character of a payment, but if a payment is in fact voluntary, protest will not make it com-

pulsory. *Chesebrough v. United States,* 192 U. S. 253, 259, 260, 48 L. Ed. 432; *Walk-A-Show, Inc. v. Stanton,* 182 Md. 405, 35 A. 2d 121. In *Baltimore v. Lefferman,* 4 Gill 425, 436, 45 Am. Dec. 145, the doctrine was considered as established "that a payment is not to be regarded as compulsory, unless made to emancipate the person or property, from an actual and existing duress, * * *. And that a payment made under the apprehension, or even menace of an impending distress warrant, would not render it a payment by compulsion." In *Lester v. Mayor, etc., of Baltimore,* 29 Md. 415, 417, 96 Am. Dec. 542, this court said: "No principle is better settled than that where a person, with full knowledge of the facts, voluntarily pays a demand unjustly made upon him, though attempted or threatened to be enforced by proceedings, as appears to have been the case in this instance, it will not be considered as paid by compulsion, and the party thus paying is not entitled to recover, though he may have protested against the unfounded claim at the time of payment made." In *Awalt v. Eutaw Building Association,* 34 Md. 435, the appellant applied for release of a mortgage; the appellee demanded payment of $2,515.90, claiming it to be due under the mortgage. Appellant objected to payment of this sum, alleging that only $2,192.50 was due, but to have the property released, with full knowledge of the facts and without any allegation of fraud on the part of appellee, paid the full amount demanded, and sued to recover $323.40, the alleged over-payment. The court after quoting the above statements from the Lefferman and Lester cases, said: "It cannot be pretended that the payment was made by the appellant under compulsion or duress. If the appellee demanded a larger sum than was due on the mortgage, the courts were open to the appellant, and there the question could be heard and determined. If he preferred to pay the demand thus made, rather than resort to litigation, no action will lie to recover it back." 34 Md. 437. See also *Jones v. Sherwood Distilling Co.,* 150 Md. 24, 35, 36, 132 A. 278.

These authorities control this case. The bill does not allege fraud or mutual mistake or show any confidential relationship. Cases cited by Williston, in which threats of foreclosure amounted to duress, were cases in which the mortgagee's demand was unlawful and precipitated a crisis from which the mortagor could not quickly extricate himself. Thirteen years is time enough to litigate a question of law and pursue a suspicion of facts.

*Order affirmed, with costs.*