### SECURITIES AND EXCHANGE COMMISSION

v.

### AMERICAN INTERNATIONAL SAVINGS AND LOAN ASSOCIATION, INC., et al.

Civ. No. 13249.

United States District Court
D. Maryland.
Oct. 31, 1961.

Joseph D. Tydings, U. S. Atty., Baltimore, Md., Allan F. Conwill, Gen. Counsel, Sidney D. Goldberg, Special Counsel, Nelson Shechtel and Richard M. Phillips, Attys., S. E. C., Washington, D. C., for plaintiff.

Leon H. A. Pierson, Baltimore, Md., Daniel J. McCauley, Jr., Philadelphia, Pa., David Brady, New York City, and Marshall I. Stewart, Washington, D. C., for American International Savings & Loan Ass'n, Inc., Marshall I. Stewart, World Wide Artists, Inc., Lloyd, Miller & Co., N. Warren & Co., Herman Price, Daniel Price, and James Seidman.

Roland W. Granat, Miami Beach, Fla., for George J. Collier.

Hooper, Kiefer & Perrott, James A. Perrott, and Edwin T. Steffy, Jr., Baltimore, Md., for John O. Stoner.

Morris L. Kaplan, Baltimore, Md., for Samuel H. Gressitt.

Jacob Yosef Miliman, Baltimore, Md., for Sidney Monen.

No appearance entered for Arthur Freedman, Royal Queen Corp. and Hiram Ricker & Sons.

THOMSEN, Chief Judge.

This is an action brought by the Securities and Exchange Commission (SEC) under sec. 20(b) of the Securities Act of 1933, as amended, 15 U.S.C.A. § 77t(b), to enjoin defendants from violating secs. 5(a) and (c) of the Act, 15 U.

S.C.A. § 77e(a) and (c),[1] by offering for sale or selling the stock of American International Savings and Loan Association, Inc. (the Association) until a registration statement has been filed with the SEC, or selling such stock until the registration statement has become effective.

The principal issue is whether the stock in question is exempt from registration under sec. 3(a) (5) of the Act, 15 U.S.C.A. § 77c(a) (5), which reads:

"Except as hereinafter expressly provided, the provisions of this title shall not apply to any of the following classes of securities:

\* \* \* \* \* \*

"(5) Any security issued by a building and loan association, homestead association, savings and loan association, or similar institution, substantially all of the business of which is confined to the making of loans to members. \* \* \*"

A second issue is whether the several defendants, other than the Association, are "underwriters" within the meaning of sec. 4(1), 15 U.S.C.A. § 77d(1).

### Facts

The original American International Savings and Loan Association, Inc., was incorporated in Maryland in March 1960. Its certificate of incorporation was amended in April 1960 to authorize: 2,000,000 shares of Class A Common Stock, $1 par; 10,000 shares of Class B Common Stock, $1 par; 20,000 shares of Class C Common Stock, $100 par; 30,000 shares of Preferred Stock, $100 par.

The provisions with respect to the Class A and Class B stock were identical, except that "no act of the corporation requiring stockholder consent shall be valid unless concurred in by not less than seventy-five per cent (75%) of the holders of Class B stock". The Class C stock was to be issued to borrowers, the Preferred Stock to depositors.

*Class B Stock, Control and History of the Association.* Defendant Marshall I. Stewart owns all the Class B stock which has been issued, 100 shares, for which he paid $1 per share. He also holds warrants, for which he paid 1¢ each, to purchase 8,000 additional shares of Class B stock at $1 per share.

The Association was managed and controlled by defendant Stewart and defendants Herman Price and Daniel Price from Stewart's offices in Washington, D. C. Defendant Monen, who was nominally president of the Association until October 28, 1960, was a figurehead.[2] Defendant Lloyd, Miller & Co., a broker-dealer, through which much of the Class A stock has been sold to the public, has its office in the same building with Stewart, and is his client. Monen was an officer of Lloyd, Miller for a time. Some 5,700 shares of Class A stock have recently

---

1. The applicable provisions of sec. 5(a) and (c), 15 U.S.C.A. § 77e(a, c), are as follows:

"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such securities through the use or medium of any prospectus or otherwise; or

"(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale. \* \* \*

"(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, \* \*."

This court has jurisdiction of the action under sec. 22(a) of the Act, 15 U.S.C.A. § 77v(a).

2. Monen occasionally signed checks in blank and left them with Daniel Price. He never attended any meeting of the directors. Monen received 1,500 shares of Class A Common Stock, giving his note therefor. The shares were pledged as collateral and the certificates were endorsed to Stewart. Monen defaulted on the note and Stewart sold the stock to the investing public without notifying Monen.

been transferred by Stewart into the name of defendant N. Warren & Company, a newly organized broker-dealer, represented by Stewart and having its office in the same small office building.

In May 1961 the original American International merged into St. Paul Savings and Loan Association, Inc., which had been incorporated in Maryland in November 1959. The primary reason for the merger was that American International did not have sufficient deposits to meet the requirements of the new Maryland regulatory statute which was to take effect on June 1, 1961. Laws of Maryland, 1961, ch. 205, sec. 161D(c) (1), the effect of which was suspended by the filing of referendum petitions before June 1, 1961. An emergency regulatory statute with similar provisions was passed by the Maryland General Assembly on June 9, 1961, and signed into law by the Governor on June 12, 1961. See Laws of Maryland, 1961, Special Session, ch. 1, sec. 160D(c) (1).

The persons who had controlled the old American International assumed control of the surviving corporation, which took the name American International Savings and Loan Association, Inc. The Articles of Merger, read in connection with previous Articles of Amendment, provide for the same four classes of stock with the same rights and limitations which the Articles of Incorporation of the original American International had provided for, but the authorized stock was increased to the following amounts: 10,000,000 shares of Class A Common Stock; 1,000,000 shares of Class C Common Stock; and 1,000,000 shares of Preferred Stock. Class B remained at 10,000 shares. The books and records of the merged associations have never been consolidated. The certificates for Class A and Class B stock issued by the original American International are still held by their owners as stock of the surviving corporation.

The 10,000 shares of Guarantee Stock which St. Paul had issued were all purchased by Stewart as attorney for an undisclosed client at an undisclosed price, and were converted into the same number of shares of Class A Common Stock of the merged association. These shares were issued in the name of Marshall I. Stewart, Atty., and some of them have been sold to the public.

The present Association is in reality a continuation of the original American International; they will be referred to collectively as the Association.

*Class A Stock Transactions.* The Association has issued 34,215 shares of Class A stock for $117,120 in cash, insiders paying $2.50 a share, the public $5 a share. It has issued 1,085 shares for services valued at $5,425. It has also issued 260,625 shares of Class A stock in connection with the following five transactions:

1. In November 1960 the Association issued 5,400 shares to 2320 McDonald Street Corporation, of which defendant Herman Price was a dominant stockholder, in exchange for a third mortgage on a building in New York. The Class A stock of the Association so issued was transferred to Lloyd, Miller, which has been selling the stock to the public.

2. In March 1961 the Association issued 25,900 shares to defendant Samuel H. Gressitt in exchange for sundry houses, mortgages, sales contracts, lots and ground rents in Baltimore City. Gressitt has transferred 1,000 shares of this stock.

3. In March 1961 the Association issued 18,475 shares to Stewart, as attorney, in exchange for land contracts in the River Forest Development, Deland, Florida. Stewart arranged for the sale of these shares to the public through Lloyd, Miller.

4. In March 1961 the Association issued 10,850 shares to A. N. Klein, a client of Stewart's, as agent for River Forest Land and Guaranty Corp., in exchange for land contracts at the River Forest Development in Florida. In July 1961 these shares were transferred to Stewart, as attorney. Shortly thereafter, 1,650 shares were transferred by him to an investor (Miss F. L. Ewald) in return for the assignment of a $15,000 mortgage

(from Barrett to Ewald—balance due $11,800), which was sold by Stewart to the Association for cash at a 10% discount below the balance due.

5. In April 1961 the Association issued to defendant George J. Collier, 200,000 shares in exchange for $1,201,988.25 of junior mortgages at Fort Lauderdale, Florida, which were already pledged to secure a loan of about $300,000. Defendant Arthur Freedman, an attorney who represented the Association in its dealings with Collier's attorney, then acted as escrow agent for at least part of the stock, which the parties understood would have to be sold to the public in order to pay off the $300,000, and free the mortgages. Some of the stock issued to Collier has been sold to the public and more has been offered for sale. The Association has never received any money on account of interest or principal on any of the Collier mortgages.

The Gressitt, Stewart, River Forest and Collier transactions were approved by the directors of the Association on May 16, 1961, by a resolution in which the directors stated that "in each case the property exchanged for Class A Common Stock was equal to the par value ($1.00) of the stock so issued". Nevertheless, the properties were entered and are still carried on the books of the Association at an average of more than five times that amount, the difference being credited to "Capital in Excess of Par Value". Stewart said that the resolution was intended to read "at least equal to the par value of the shares so issued", and a stock issuance statement to that effect was filed. It is noteworthy, however, that the directors did not commit themselves to any such value as is shown on the books.

In June 1961, after the merger, the Association issued 113,334 shares to defendant Hiram Ricker & Sons, in exchange for an $850,000 note, which purported to be secured by a mortgage on real estate

in Maine. It developed that the mortgage was forged and not a lien on the real estate, and the Association has attempted to revoke the transaction. It has released the mortgage and has secured the return of 47,000 shares of the stock, but 66,334 shares are still outstanding in the name of defendant Royal Queen Corporation.

*Preferred Stock.* The Articles of the Association provide: "Preferred Stock shall be known as Preferred Share Accounts or Savings Share Accounts". Deposits in the amount of $229,241.35 were outstanding on August 31, 1961. Deposit books rather than stock certificates have been issued to depositors, who are entitled to receive cumulative dividends of at least 3½% before any dividends are paid to holders of Class A and Class B Common Stock. No provision is made for dividends on Class C Stock.

*Class C Stock and Two Loans Made by the Associations.* The Articles of American International have always provided: "Loans shall be made only to the holders of Class C common stock so that the purchase of Class C common stock shall be a prerequisite to the obtaining of a loan from this Corporation".

No Class C stock has ever been issued.[3] Indeed, it appears from the minutes, books and statements offered in evidence that American International made no loans before the merger. One loan made by St. Paul before the merger is open. Since the merger, the Association has made one loan. The loans referred to above are:

(1) a $179,550 construction loan (Embassy Development) for the construction of ten houses, which absorbed almost all of the assets of St. Paul;

(2) a $25,000 construction loan (Builders' Development) secured by a mortgage on a building now being built in Florida.

*Purchase of Mortgages.* The only mortgages shown on the books, aside from those received in exchange for Class

---

3. The court recognizes that the practices of bona fide associations differ with respect to the issuance of stock to persons making bona fide loans. This opinion does not intimate more than is necessary for the decision of this case.

A stock, are the two following mortgages purchased for cash by the Association:

(1) a $47,487.18 construction loan (Cypress Eternal Furniture), secured by a mortgage on Florida property,

(2) a second mortgage (Smith) carried on the books at $11,800, although much less was paid for it.[4]

*Miscellaneous.* The principal office of the Association is in Takoma Park, Maryland. It has two branches in Baltimore and one each in Bethesda and Bel Air, Maryland, where deposits are received.

No registration statement is on file with the SEC covering any stock of the Association.

### Discussion

#### I.

Sec. 3(a) (5) of the Securities Act, 15 U.S.C.A. § 77c(a) (5), provides that the registration requirement shall not apply to "[a]ny security issued by a building and loan association, homestead association, savings and loan association, or similar institution, substantially all the business of which is confined to the making of loans to members". The scope of the exemption is made clear in House Report No. 85, 73rd Cong., 1st Sess. (1939), at p. 15, where it is said: "Paragraph (5) exempts the securities of building and loan associations and similar institutions, but insists that such institutions as a condition to being exempt from the Act must do a true building and loan business by confining their business to the making of loans to their members."

Language almost identical with that contained in sec. 3(a) (5) had been previously used by Congress in granting an income tax exemption to such associations, e. g. in sec. 231(4) of the Revenue Act of 1921 (42 Stat. 227). In connection with the 1921 Act, House Report No. 350, 65th Cong., 1st Sess. (1921), pp.

13–14, had stated: "Under the present law some mortgage and investment companies have been able to obtain this exemption by operating in the guise of building and loan associations. By limiting the exemption to 'domestic building and loan associations operated exclusively for the purpose of making loans to members', this abuse will be prevented."

The Supreme Court has repeatedly held that exemptions from a regulatory statute are to be strictly construed and that the burden of proof rests upon the party who claims the exemption. Securities and Exchange Commission v. Ralston Purina Company, 1953, 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494; Federal Trade Commission v. Morton Salt Company, 1948, 334 U.S. 37, 44–45, 68 S.Ct. 822, 92 L.Ed. 1196; Spokane & Inland Empire Railroad Company v. United States, 1916, 241 U.S. 344, 350, 36 S.Ct. 668, 60 L.Ed. 1037. In determining whether a corporation is entitled to such an exemption, the character of business actually done by the corporation controls, not its name or charter powers. Bowers v. Lawyers Mortgage Co., 285 U. S. 182, 188, 52 S.Ct. 350, 76 L.Ed. 690. No decision construing sec. 3(a) (5) of the Securities Act has been cited or found, but several decisions construing the similar language in several Internal Revenue Codes must be considered.

In United States v. Cambridge Loan and Building Company, 278 U.S. 55, 49 S.Ct. 39, 73 L.Ed. 180, construing the 1921 Revenue Law and an earlier statute which had exempted savings and loan associations without qualification, the Court said: "The statutes speak of 'domestic' associations, that is, associations sanctioned by the several States. They must be taken to accept with the qualifications expressly stated what the States are content to recognize, unless there is a gross misuse of the name. The State of Ohio has recognized and still recognizes

---

4. Stewart testified that there were two or three other mortgages made by the Association, now outstanding, all on Maryland property, but they do not appear on any statement or record of the Association to which my attention has been directed. St. Paul had made two loans which had been paid off before the merger.

the respondent as belonging to the class which its name indicates." 278 U.S. at page 59, 49 S.Ct. at page 40.

The opinion of the Court of Claims in the Cambridge case, 63 Ct.Cl. 631, more fully than the opinion of the Supreme Court, shows the extent to which Cambridge had been supervised and regulated by the Department of Building and Loan Associations of the State of Ohio.

Until June 1961 there was no agency in the State of Maryland vested with comparable supervisory authority. However, some of the provisions of Art. 23, Ann. Code of Maryland, 1957 ed., granted and limited the powers of corporations designated as "homestead or building associations" and expressed the public policy of the State. Art. 23, sec. 150, limited investments of such associations to "cash, fixtures, or loans on hypothecated stock of such associations, judgments or decrees for payment of money received by courts in this State, mortgages on real or leasehold estate situate in this State, ground rents issuing from real estate located in this State, bonds of this State and bonds or other obligations of, or guaranteed as to principal and/or interest, by the United States." [5]

 The occasional violation of these provisions would not prevent an association from being considered a savings and loan association in Maryland or within the meaning of sec. 3(a) (5) of the Securities Act. In the case at bar, however, we are not dealing with an occasional violation of the laws, but with an association which continually ignored the controlling provisions of the Maryland statutes. Before the passage of the 1961 Act the Attorney General of Maryland had stated in a formal opinion, June 23, 1960, that "it is not altogether clear what a building and loan is intended to be in Maryland". However, the Maryland statutes and the many Maryland cases discussing the activities of building and loan associations show that the general concept of such associations in Maryland was substantially similar to the general concept throughout the country.[6] That concept was clearly stated in Perpetual Building and Loan Association, 34 T.C. 694, affirmed sub nom. Estate of Cooper (Perpetual Building and Loan Association) v. C. I. R., 4 Cir., 1961, 291 F.2d. 831, 832, the Court of Appeals stating, per curiam, that the issues of law involved were "carefully and correctly discussed in the opinions of Judge Fisher speaking for the Tax Court". Judge Fisher had said:

> "Mutuality among members is an essential attribute of a building and loan association, and the exemption statute under consideration recognizes this in limiting the exemption to building and loan associations, substantially all of the business of which is confined to making loans to members. Other factors of mutuality relate to the control and management of the business and its assets, and, in a more fundamental sense, to the opportunity and means it affords the members for saving and borrowing for home owning. Unlike a banking institution which operates primarily for the benefit of its investing stockholders, a building and loan association is, fundamentally, intended to be conducted for the benefit of its borrowing members as well as nonborrowers. This includes the principle that borrowing members are to receive substantially proportionate treatment with respect to profits as nonborrowers. See, Oul Building & Loan Association, 6 B.T.

5. Sec. 160Z, recently enacted, Laws of Maryland, Sp.Sess., 1961, ch. 1, permits savings and loan associations to invest in real estate or leasehold property "situate in this State" or within a 50 mile radius of its principal Maryland office. The same section also requires, in subsection (c), that any mortgage held by an association must be a first lien on the realty "except that such mortgage may be a second lien if the first lien on said property is held by the association".

6. See e. g., Magness v. Loyola Federal Savings & Loan Association, 1945, 186 Md. 569, 47 A.2d 769; Poole v. Miller, 1957,. 211 Md. 448, 128 A.2d 607.

A. 1196, 1203 (1927) ; Law of Building and Loan Associations, Joseph Sundheim, 3 ed. p. 10." [7]

The opinion in the Perpetual case then noted that in addition to the indispensable attribute of mutuality, the federal statute requires that substantially all of the loans must have been made to members, and referred to the rule that "membership is generally not implied from the mere fact that a loan is obtained from the association." 34 T.C. at 711. In Maryland we must also consider Art. 23, sec. 157, Ann.Code of Maryland, 1957 ed., which provides that all borrowers from such associations and all persons assuming or obligated upon loans made or held by such associations are considered members thereof.[8]

The opinion in the Perpetual case continued:

"Likewise, while variations from the norm or original plan of the loan association are no doubt permissible, we think it clear that loans to contractors for building and construction purposes, or for the construction of commercial buildings, do not constitute the business of making loans to members within the ambit of section 101(4), supra, under the circumstances presented by this record. Cf. I.T. 1961, C.B. III–1, page 259; I.T. 2283, C.B. V–1, page 293; G.C. M. 1231, C.B. VI–1, page 82. While it is difficult to draw a precise line as to how far a building and loan association may engage in extraneous activities without losing its basic character, it seems clear that 'when it ceases to be substantially mutual and adopts as its chief business dealing for profit with the general public by the methods of an ordinary savings bank, it is no longer a building association, entitled to be exempted from income taxation under the statute in question'. Lilley Building and Loan Co. v. Miller, 280 F. 143, 146 (D.C.S.D.Ohio, E.D. 1922) affirmed per curiam, 285 F. 1020 (C.A.6, 1923), certiorari denied, 262 U.S. 754."

Defendants do not seriously dispute these principles, nor deny that they are applicable to the exemption under the Securities Act, but contend (1) that the Association was issuing stock to raise capital for its regular business, (2) that the Maryland law in effect at the time the stock was issued did not prohibit the issuance of various classes of stock for those purposes, and (3) "that the corporation did not deviate from the corporate purposes set out in the Articles of Incorporation and its By-Laws".

■ Their contention (2) is correct,[9] but not conclusive on the question at issue in this case, in view of the wording of sec. 3(a) (5) of the Securities Act, 15 U.S.C.A. § 77c(a) (5), quoted above.

■ Their contention (3) is relatively unimportant. It is true that the Articles of the Association prepared by its counsel and approved by the State Department of Assessment and Taxation permitted it to issue stock for property, and contained a clause, customarily included in all kinds of Maryland Articles, entitling the corporation to transact its business in any State, district, territory, or possession of the United States, including the District of Columbia and government reservations, or in any foreign country.[10] This

---

7. See also Louisville Gas & Electric Co. v. Coleman, 277 U.S. 32, 40, 48 S.Ct. 423, 72 L.Ed. 770.

8. On the other hand, it should be noted that in the instant case the Articles of the Association have always provided: "Loans shall be made only to the holders of Class C common stock so that the purchase of Class C common stock shall be a prerequisite to the obtaining of a loan from this Corporation." No Class C common stock has ever been issued.

9. See the Opinion of the Attorney General of Maryland cited above.

10. Sec. Third of the Articles of Incorporation, as amended in May 1961, reads: "The purposes for which the Corporation is formed are as follows: To accumulate funds for the benefit of the members, to render financial assistance to

precautionary provision did not eliminate the requirements of Art. 23, sec. 144 et seq., of the Maryland Code, particularly sec. 150, quoted above, and did not eliminate or modify the provisions of sec. 3(a) (5) of the Securities Act, 15 U.S.C.A. § 77c(a) (5), quoted above.

■ Defendants' argument falls with the failure of its contention (1). I find as a fact that the Association was not issuing stock to raise capital for its regular business when it entered into the transactions described in the findings of fact above. Some shares were indeed issued for cash. But the vast majority of the shares of Class A stock were issued for slow-moving, dubious assets. In many of the transactions the active managers of the Association had substantial personal interests, including the marketing of the stock issued in exchange for those assets. The assets so acquired are not adapted to provide funds for loans to members; only two loans have ever been made by American International, even with the cash received from depositors or from the sale of such Class A stock as was sold for cash.

I find that the regular business of the Association has been and was intended to be the issuance of its stock in exchange for various interests held by Stewart, his clients and others in real estate throughout the country, and the marketing of that stock to the public through Stewart and his clients, who controlled the Association, and their associates. Defendants concede that some of these transactions have been "unwise or unfortunate". Although the legality of the transactions is not in question here, they throw light on the true character of the corporation.

The investment pattern which American International has followed from its inception shows that it was not operating as a savings and loan association within the meaning of the Maryland law at the time the securities were originally issued, before June 1961. In my opinion it would not have been treated as such by the Maryland courts, since there had been a "gross misuse of the name", within the meaning of the Cambridge case.

It is perfectly clear that American International is not a savings and loan association within the meaning of the Maryland statute presently in force. Acts of 1961, Sp.Sess., ch. 1. See particularly secs. 160A(a) and (f), 160B(a), 160M, 160P, 160Q, 160W, 160Y, 160FF, and 160–II.[11]

It is equally clear that American International does not meet the further requirement of sec. 3(a) (5) of the Securities Act, 15 U.S.C.A. § 77c(a) (5), in that it has never been a "savings and loan association, or similar institution, substantially all the business of which is confined to the making of loans to members".

It follows that the securities issued by the Association are not entitled to the exemption from registration provided by sec. 3(a) (5) of the Securities Act, 15 U.S.C.A. § 77c(a) (5), quoted above.

its members by making them loans or advances upon such real or personal property, or other lawful security as its Board of Directors may determine, and to perform all acts usually performed by a homestead or building and loan association as authorized by its constitution and by-laws and by the general and local laws of the State of Maryland and by the laws of the United States of America; the above granted powers are to be in furtherance and not in limitation of the general powers conferred by the laws of Maryland upon corporations, and this Corporation shall be entitled to transact its business in any state, District, territory, or possession of the United States, including the District of Columbia and government reservations, or in any foreign country."

11. Sec. 160–II exempts the sale of free share accounts of any association doing business in Maryland from the Blue Sky Law of the State, but no such exemption is granted to "guaranty stock", the only other kind of security which an existing association will be permitted to have after January 1, 1962. See sec. 160D. American International will be required either to convert its Class A and Class B stock into guaranty stock or to mutualize by January 1, 1962, in order to continue to call itself a savings and loan association. A new association will not be permitted to issue even guaranty stock.

The provisions of sec. 5(a) and (c), 15 U.S.C.A. § 77e(a, c), quoted in note 1 above, apply.

■ Since this failure to qualify for the exemption is due to the failure of the Association to meet the tests set out in sec. 3(a) (5), none of the securities of the Association are exempt. The Preferred Stock is subject to the provisions of sec. 5(a) and (c), as well as the Class A and Class B Common Stock.

## II.

■ Since the securities of the Association do not qualify for the exemption provided by sec. 3(a) (5), 15 U.S.C.A. § 77c(a) (5), it is obvious that the provisions of sec. 5, 15 U.S.C.A. § 77e, apply to sales of stock by the Association itself. The sale of such stock by the other defendants also violates sec. 5 unless those defendants are able to qualify for exemption under sec. 4(1) of the Act, 15 U.S.C.A. § 77d(1), which states:

"The provisions of section 5(a) shall not apply to any of the following transactions:

"(1) Transactions by any person other than an issuer, underwriter, or dealer; * * * "

The terms "issuer" and "underwriter" are defined by sec. 2(4) and (11), 15 U.S. C.A. § 77b(4) and (11), as follows:

"(4) The term 'issuer' means every person who issues or proposes to issue any security; * * *

"(11) The term 'underwriter' means any person who has purchased from an issuer with a view to, or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, * * *. As used in this paragraph the term 'issuer' shall include, in addition to an issuer, any person directly or indirectly, controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer."

■ The burden is on the several defendants to prove their claimed exemption from the provisions of the Act, the broker-dealers as well as the other defendants. Securities and Exchange Commission v. Ralston Purina Company, 1953, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494; Gilligan, Will & Co. v. S. E. C., 2 Cir., 267 F.2d 461, certiorari denied 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 461; S. E. C. v. Culpepper, 2 Cir., 270 F.2d 241. They have failed completely to meet this burden.

■ The Association itself is an "issuer", as that term is defined in sec. 2(4) and used in sec. 4(1), quoted above. All of the other defendants are "underwriters", as that term is defined in sec. 2(11) and used in sec. 4(1).

■ The issuance of the Class A Stock in exchange for junior mortgages and other interests in real estate and its subsequent sale to the public under the circumstances set out in the statement of facts above, amounted to the "distribution" of such stock, as that term is used in sec. 2(11). Gilligan, Will & Co. v. S. E. C., supra. Some of the persons and corporations to whom the stock was issued "purchased" it from the issuer with a view to such distribution, S. E. C. v. Guild Films Co., 2 Cir., 279 F.2d 485, 489 (1960) [12]; other defendants are selling it for an "issuer" in connection with the distribution, or participated or have a direct or indirect participation in the undertaking. As used in the preceding sentence, the term "issuer" is defined by sec. 2(11) to "include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer."

■ The defendants Gressitt and Collier are not shown to have been directly associated with American International or with Stewart and his clients before the transactions listed above. Gressitt later became a director. Collier has urged that an injunction should not be issued

12. Certiorari denied sub nom. Santa Monica Bank v. S. E. C., 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed.2d 49.

against him. But it is quite clear that he joined in the scheme, presented to him by Freedman, a representative of the Association, to transfer to the Association his equity in the junior mortgages, which were already pledged to secure a loan of some $300,000, in exchange for 200,000 shares of Class A stock, and to participate in the distribution of such stock to the public, at least to the extent necessary to pay off the $300,000.

Neither Collier nor Gressitt nor any other defendant has shown that he did not acquire the stock with a "view" to distributing or offering it to the public. See sec. 2(11). The fact that some of the defendants may have purchased the shares under a bona fide belief that the securities could be sold without registration does not overcome the statutory policy designed to protect the public. See S. E. C. v. Guild Films, Inc., supra, 279 F.2d at page 490. The brokers Lloyd, Miller & Co. and N. Warren & Co. are closely associated with Stewart and the Prices in the distribution of the stock.

Royal Queen Corporation has not appeared, and there is no evidence whatever with respect to it, except that some of the stock issued to Hiram Ricker & Co., which has been canceled on the books of the Association, now stands in the name of Royal Queen. World Wide Artists, Inc., is Stewart's client. It received 1,500 shares of Class A stock from Collier and 1,500 shares from Stewart, so that it could borrow money on the security of that stock. However, since neither Royal Queen nor World Wide has met the burden of proof resting on it, an injunction should be issued against both of them as well as against the other defendants.

The public to whom the stock is being offered as stock in a bona fide savings and loan association needs the protection afforded by the Act.

The court will enter a judgment enjoining all defendants as requested by the Securities and Exchange Commission.[13]

13. "Final Judgment:
"This cause came on to be heard upon the plaintiff's motion for a preliminary injunction and the Court having considered the pleadings and having heard the argument of counsel and it appearing to the Court that the plaintiff is entitled to a final judgment permanently enjoining the defendants from engaging in acts and practices which constitute and will constitute violations of Section 5(a) and (c) of the Securities Act of 1933, as amended [15 U.S.C.A. § 77e(a) and (c)] and the Court being fully advised in the premises:
"It is Ordered, Adjudged and Decreed that the defendants, American International Savings and Loan Association, Inc., Marshall I. Stewart, Arthur Freedman, World Wide Artists, Inc., Royal Queen Corporation, Hiram Ricker & Sons, Lloyd, Miller & Co., N. Warren & Co., George J. Collier, Samuel H. Gressitt, Herman Price, Daniel Price, James Seidman and Sidney Monen, their officers, agents, servants, employees and attorneys, and each of them, be and hereby are permanently enjoined from:

"(i) Directly or indirectly making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell the common stock Class A, common stock Class B, common stock Class C, or preferred stock of American International, or carrying such securities or causing them to be carried through the mails or in interstate commerce by any means or instruments of transportation for the purpose of sale or delivery after sale, unless and until a registration statement is in effect with the Securities and Exchange Commission as to such securities.
"(ii) Directly or indirectly making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of any prospectus or otherwise, the common stock Class A, common stock Class B, common stock Class C, or preferred stock of American International, unless and until a registration statement has been filed with the Securities and Exchange Commission as to such securities.
"Dated this 31st day of October, 1961."